### Holliday, etc. v. Holliday, etc.

(Decided December 10, 1914.)

Appeal from Clark Circuit Court.

1. Wills—Use of Intoxicants by Testator—Mental Capacity—Undue Influence.—Proof with reference to intoxicants and the long continued use of the same by the testator, was competent as affecting his mental capacity as well as his susceptibility to undue influence.

2. Wills—Scintilla Rule.—The scintilla rule applies to will contests as well as other cases.

3. Wills—Undue Influence—Instruction Upon—It is the duty of the court to give an instruction on undue influence where all the circumstances taken together raise that question.

JOHN M. STEVENSON, W. C. G. HOBBS, JOHN R. ALLEN and F. H. HAGGARD for appellants.

PENDLETON, BUSH & BUSH, WILLIS, TODD & BOND and G. F. WYCOFF for appellees.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

Amanda Holliday, the widow, and her children by a former marriage, are the appellants, and propounders of the alleged last will of Stephen Holliday, deceased. Her first husband was Benjamin Holliday, a brother of Stephen. The appellees are the contestants—about 25 in number—and the children of the other deceased brothers and sisters of Stephen Holliday. The contest is based on mental incapacity and undue influence. These

questions were submitted to the jury, and their finding was against the will. The propounders appeal.

The form of the instructions is not criticised. Three grounds for reversal are urged, viz.: (1) There was not a scintilla of evidence upon which to base an instruction on undue influence. (2) That the the use of intoxicants by a party which will authorize the setting aside of his will and testament must have been such that he was entirely deprived of his reason and understanding; that moderate drinking continuously, and occasional sprees of drinking do not invalidate a will; and (3) That the verdict is against the law and is not supported by the evidence; that an overwhelming preponderance of the proof is in favor of the validity of the will.

The proposition of law stated in the second ground is undoubtedly correct, but we do not see, from the record, any controversy on this point. The instructions made no reference to intoxicants. Only two questions were submitted to the jury; the first was, whether Stephen Holliday was mentally capable of disposing of his property, and, second, whether the execution of the will was the result of undue influence exerted upon him. There was a great deal of proof with reference to intoxicants and the long continued use of the same by testator, but this was competent as affecting his mental capacity as well as his susceptibility to undue influence. The whole case comes down to a question of fact, and the established doctrine is that the scintilla rule applies to will contests as well as other cases.

It is equally well recognized that direct proof of undue influence can seldom be had, and, as a rule, must be proven by circumstances. Each circumstance standing alone might be inconclusive; yet, if all the circumstances taken together raise the question, it is the duty of the court to give an instruction on undue influence. Milton v. Hunter, 13 Bush, 163; Frye v. Jones, 96 Ky., 149; Lischy v. Schrader, 104 Ky., 657; Wood's Exr. v. Devers, 14 Ky. L. R., 82; Meuths' Exr. v. Meuths, 157 Ky., 790.

We quote from McConnel's Exr. v. McConnel, 138 Ky., 783:

"In will cases, where the grounds of contest are undue influence and mental capacity, the evidence is necessarily allowed to take a wide range, and every fact and circumstance that may throw light upon either of these facts is admissible."

In the light of these statements of the law, particu-

larly applicable to this case, we come now to consider the facts, which the jury evidently deemed sufficient to constitute undue influence and mental incapacity.

Of the Hollidays there were five brothers and three sisters. Two of these brothers were at some time confined in a lunatic asylum, and a sister died there. There is proof that others were similarly afflicted. The oldest brothers were Milton and Stephen. From 1854 to 1889, when Milton died, these two brothers lived together as bachelor hermits. They were good farmers and successful traders, and accumulated about 700 acres of fine land. All of the farm was cultivated and well stocked. They were boon companions and all their holdings were in common. Milton seems to have been the moving spirit. There is evidence that they executed simultaneous wills so that the survivor would take all the property. When Milton died, his will was probated and Stephen was sole devisee. If Stephen made a will, it is not in evidence, but no one disputes that it was understood he would make such a will, if, in fact, he did not. While they were men of strong character, and self-willed, even eccentric, they did not lack for friends. But this was in some measure due to a five-gallon keg, in which they kept an ample supply of whisky, and from which they, and as many of their neighbors as cared, drank regularly, if not too much. To a like source may be attributed the estrangement and difficulty that arose between the two brothers in 1885. At any rate, from some trifling circumstance, the brothers fell out, and Stephen shot Milton through the arm, crushing the bone. Milton lived four years after this, and in the same house with his brother Stephen, but never became reconciled to him. There is evidence to show that some one stayed between them all the time to prevent a renewal of the conflict. After Milton's death, a contest of his will was threatened, and Stephen, fearing that the contestants would likely succeed because of the well-known family taint of insanity, and Milton's dislike for him, talked with some of the family leaders and begged them not to contest. He told them that a lawsuit was not only distasteful, but useless. He was then about 65 years of age. In connection with the fact that he was unmarried, he assured them that he never intended to marry, and, with a little patience, the heirs would get all the property anyhow. As a consequence, the contest was abandoned. But Stephen seemed to brood over the death of his

brother and their estrangement. Numerous witnesses testify as to his conversations about it and the deep impression it made upon him. He continued to send the five-gallon keg to town as often as it needed replenishing, and drank from it many times every day. Except on two occasions, there is no evidence that he was ever drunk. Perhaps on no other subject is opinion evidence so prolific and yet of as little value. Opinions as to just what constitutes drunkenness are as varied as the amount necessary to produce that effect on different individuals. If such estimates are unsatisfactory, although uniform, as in this case, it is certain that when at home he drew from the cask, and if out on the farm, he drank from the flask which he invariably carried. If he did buy the cheapest whisky, he lived long enough to wear out the keg and get many years' service from another.

Stephen continued to live a hermit life at the home place after Milton's death. He retained one negro servant, Alfred Webb, and for whom he frequently expressed affection and an intention to see that he was cared for if Alfred survived him. No serious effort was made to cultivate the farm, and blackberry thickets took possession. The fencing and improvements were not repaired. Alfred Webb cultivated a few acres, but it brought no income. Stephen bought no more stock and did no trading of any sort, nor did he attempt to sell any stock from the place. In fact, years afterwards, when they had a public sale, there were horses and mules on the place 15 years old and not bridle-wise, and hogs so wild that they had to be shot down with rifles. His income dwindled to $200, as estimated by some witnesses, and this came chiefly from blackberries which the neighbors picked. On these old Negro Alfred collected for him a royalty of 5 cents per bucket.

About nine years after Milton's death, Stephen, while sleeping in his room alone late one night, was alarmed by a noise at the door, and, in response to his inquiry, a panel was smashed with a sledge hammer, and he perceived the hand of a black man reaching through to raise the latch on the inside. This hand proved to be that of Asa Murray, a notorious negro of the neighborhood. He was leader of a desperate band, and, no doubt, intended to rob and murder Mr. Holliday. In the way of weapons Stephen only had a shot gun, and it contained but one load. Luckily it was beside his bed, and, rais-

ing it, he drew aim on the hand and shot it off. The robbers ran, but Stephen never allowed any one to wash the blood from the floor which dripped from the hand that lay there all night. As might be supposed, this incident also made a very deep impression upon him. He seems to have told every detail of it, and would repeat it as often as they would give ear to him. From this time he kept in the house three repeating rifles, two shot guns and two pistols.

Because of this circumstance, his relatives considered it necessary for some of them to live in the home with him. Among the relatives who seemed most zealous for his welfare was Amanda, widow of his brother Ben, and her daughter, Mrs. Shealey. Also Felix Holliday, a son of Stephen's deceased brother, Lewis. Felix, on invitation of the old man, went over to live with him. This was in the spring of 1898. Felix only stayed a few days and moved away to Missouri. He says that his Aunt Amanda interfered, and from his uncle Stephen he learned that she told him Felix might involve him in some domestic troubles. When Felix departed, Mrs. Shealey and her husband moved in. During the fall of that year, Shealey and Mr. Holliday had a falling out over some matters of small consequence, and Shealey drew a pistol and threatened to shoot him. This terminated their relations for the time being, and Shealey and wife moved to Lexington, 16 miles away. Felix returned from Missouri, as he says, on the old man's request, and remained with him until the marriage in 1902. Felix says he got along alright with the old man except when Amanda would come over to see him. After her visits the old man would get angry with him, because of things which he said Amanda told him derogatory to Felix. The old man was rheumatic and weighed over 200 pounds, and after the Asa Murray incident, was rarely able to leave the house. He was in bed a great part of the time. In this connection, we may say that Felix was kind and attentive to him, and his treatment of the old man was as considerate as may be expected of one man to another. He lived nine years after his marriage to Amanda, and no one questions the fact that she, too, was as kind and attentive to the old man as a wife could possibly be. But, through it all, and with them all, there is one outstanding fact, and that is, the old man's property and its ultimate disposition. This

influenced every act of those who came in contact with him.

To tell the story connectedly, we revert to the Shealey departure in the fall of 1898. In the following spring a closed carriage drove up to the Holliday home containing Shealey, his wife, and a lawyer. Who this lawyer was no one knows. Shealey was dead at the time of the trial, and Mrs. Shealey testified that she could neither name nor describe the lawyer or any feature of him, although admitting the trip and the fact that they had a private conversation with the old man for the purpose of settling a controversy. She says the controversy was about some sheep that Shealey owned and left on the place. As they went in, Felix was asked to step out, but, knowing the enmity that existed between the old man and Shealey, he suspected some design upon him, and eavesdropped. He heard Shealey charge the old man with having tried to alienate the affections of his wife and referred to a circumstance when the old man attempted to embrace her, and he heard his uncle reply that she did not resent his advances. After some further conversation, in which the lawyer took a part, he heard Stephen counting money to them. Several witnesses testify as to conversations with the old man about this circumstance, and, except the amount of money paid, he told them all about it. The whole neighborhood from that time seems to have been aware of the great dislike which the old man entertained for Shealey. As evidence of this, one of appellant's witnesses was a commissioner in the division of the lands of Benjamin Holliday, deceased. That farm adjoins Stephen's. This witness swears that Stephen begged him to see that no land adjacent to him should be laid off to Mrs. Shealey. The old man continued practically bedfast. Felix and other corroborating witnesses, most of them interested, however, tell of the old man's eccentricities, hallucinations, and toddies with increasing frequency. He would imagine a return of the robbers, and see their faces at the window, or forms outlined on the wall, but was unable to recognize his friends and relatives as they would come to see him, or to understand their relationship. About this time, however, he did begin to entertain marrying notions. But, in speaking of this, it was always in connection with some young girl—no one in particular. In this regard, Amanda was the only one who seemed to take him seriously, and she concluded that if they did

not marry him into the family, he would likely marry out of it, with the result that the property would be divided, if not diverted. Felix grew tired of staying there, and when Amanda indicated a willingness to sacrifice herself in marriage for the family good, Felix made no objection.

Amanda's sister testifies that Amanda told her "she married Mr. Holliday to keep the money in the family; that if she didn't marry him he was going to marry a younger woman." Felix says his Aunt Amanda told him "to come over there (her home) and carry her down to Lexington to help her put the bridle on the old man, and she would hold him." Acting on this request, Felix did take her to Lexington March 11th, 1902. The marriage occurred on the 17th. Amanda says they had been engaged for a year, although he was then 77 and she was 65 years old. She wanted a preacher, but he wanted a magistrate, "everything plain, an old-fashioned wedding." "I wouldn't do it, and he said, select a place and time that suits you, and I will go whenever you send me word." Continuing, she says, "I went on to town (Lexington) to see the girls, and then sent for him—sent word that I had found a place, and if he would come, we would be married, which he did." Her daughter, Mrs. Shealey, says she "moved him," and Mr. Shealey helped her. This is the same Shealey with whom he had not been on speaking terms for four years. On cross-examination, Mrs. Shealey explains that in the meantime she had been the bearer of mutual apologies, and at this time they bore no grudges. How they "moved him" is best told by Mrs. Shealey. When informed of the engagement, Mrs. Shealey inquired of her mother:

"How would it do to come to my house and be married, and I will go and get the old gentleman down here? And I said, 'I will go for him.' And she said, 'Well, drive down and see what he will say.' And we (Shealey and wife) hired a carriage from Ben Wilson's stable and drove down. I went in, both went in, and I said to him, 'How are you, Uncle Steve'? He said, 'Come in, have a chair and warm.' And we sat down by the fire; he was lying on the bed. It was in the morning, and he was lying across the foot of the bed suffering with a severe toothache, and his jaw was so swollen that he couldn't use it, and he said to come in and stay; and I said, 'Well, you will make a peculiar looking bridegroom.'

That's the way I approached him, and he kind of laughed, and I said, 'Mother says you are engaged and want to marry at Becknerville.' And he said, "Right now I am not in any condition; what does she say about it'? She is in Lexington; and I said, 'She told me to hire this rig and come down here, and see if you wanted to come to Lexington'? He said, 'I am feeling so bad I cannot make the trip.' I said, 'Won't you make the trip'? He said, 'I cannot do anything for this toothache,' And I asked him what he had tried to do for it, and what he had there to do for it, and he said, 'Yes, I have tried tobacco and I have tried whisky, and that won't do any good.' And I said, 'I will try turpentine,' and I packed his tooth around with turpentine, and he was lying down. He said, 'Stay until after dinner.' And he called the cook in and had her fix us a nice dinner, for Felix was living there at the time, and he asked Felix to see that the horse was taken to the stable and fed, which my cousin did. And finally I said, 'Well, it is getting late, and I must go.' And he said, 'My tooth is so much easier, if you will dress me, I will go.' And I said, 'I hardly think you are able to make the trip.' And he said, 'I want to see Mandy. I want to have something done with this tooth.' And he got up and got in the carriage, and after we had got down on the road, he said he felt very bad, but he wanted to see Mandy. I told him I would take him back and make another trip for him, and he said, 'No, take me to Mandy, and, if I die on the road going to her, take me to her.' "

It was bitter cold weather, and they reached Lexington after dark. This was his first time out of doors for more than a year. Out of deference to his wishes for a plain wedding, Amanda wore plain clothes—that is, she did not make up anything new. He wore his funeral shroud ordered years before. The Shealeys thoughtfully brought it along. That he might have his way, they also consented that he remain seated during the ceremony. On the next day a physician was called to examine him. This physician came again on the 19th and 25th. Also on April 8th and June 6th. We quote his testimony:

"Q. What was the old gentleman's trouble at that time? A. Well, when I walked into the room, the old gentleman was sitting in a chair; I remember it was rather cool, and they had quite a large fire, and they all seemed to be laughing, and much amused, and I asked the question, what caused the amusement, and they said

there had been a marriage.  *  *  *  Q. What was he doing at that time? A. Well, he was sitting in a chair, and wasn't saying anything at all. In fact, it was almost impossible to get him to do any talking. When I would ask him questions, he would look at me and smile, and about the only thing I could get from him was a smile. He didn't talk at all.  *  *  *  When I asked the question, the questions were answered by Mr. Shealey.  *  *  *  For instance, I asked him how he was complaining, and I was informed he was complaining about his side, that he was suffering with his side.  *  *  * I think very much under the influence of liquor.  *  *  * Well, he told me that he would see me the next morning, and I went the next morning, I think, between eleven and twelve o'clock, and walked in the room, and found him in bed, lying in bed, with his clothes on, and his boots.  *  *  *  He was in a very weak condition; he struck me as being a very old man and very childish.  *  *  *  Mr. Holliday's condition was very much depleted, and he seemed to be exceedingly childish, impressed me that he had suffered from a chronic softening of the brain; he seemed to be indifferent to what you would say to him; didn't seem to dwell on any subject at all. I talked to him about his symptoms and tried to prescribe for him on that idea.''

Mr. and Mrs. Holliday stayed in Lexington with the Shealeys until July. A son of the marrying magistrate was a real estate man and Shealey was his bybidder. From the time of his brother's death the old man had added nothing to the estate, but it seemed his interest suddenly revived, and during his short stay he made three investments in Lexington real estate—about $8,000 altogether. He also purchased an automobile and a carriage. Notwithstanding the circumstances, the real estate investment proved profitable. The marriage marked other changes in the old man's attitude. He began to charge rent against Alfred Webb, the old negro servant. He cut off a $50 annuity to his insane sister.

In July the Hollidays returned to the farm. On March 13th, 1903 (the following year), his will was written, but that was the second attempt. The attending physician and a neighbor acted as attesting witnesses, and a Lexington lawyer, brother-in-law of the physician, was called to write it. The physician admits that he made all the arrangements. He says, ''These people lived in rather a secluded place in winter and

*they* asked me to get some one to write this will for him.'' The first attempt was about ten days before, and without success. Mrs. Holliday, while denying that she was a factor in procuring this will, and insisting that she did not know that the lawyer and witnesses were coming, yet admits that she met them at the door, and, without any preliminaries, "told them he was not going to make a will that day—I told them he was not in condition to do anything." The parties went into his room and found him lying in bed under the influence of liquor, as they describe him. When he was aroused, and the doctor proceeded to examine him, the old man flew into a rage, drew his cane and ordered them out. The doctor testifies: "He was abusing me; I approached him and he told me to get out of there or he would hit me with that stick." Mrs. Holliday says that he was not drunk— only excited; that she had given him but two drinks that morning. The colored girl says that she also gave him one. Ten days later they again met at the old man's home, but in the meantime the colored girl had been discharged. On this occasion there is no difference of opinion as to the condition of the old man, or the amount of liquor he had taken. All testify that he understood everything and was mentally competent to make a will. The physician and attending witnesses say the lawyer asked him what he wanted to do with his property, and he said "he wanted to give it to his wife." The lawyer testifies, "He said he wanted to leave everything to his wife, and he wanted her to have it absolutely to do as she pleased with it." The will reads that way. The will was then delivered to Amanda and safely kept by her until the time of probate, about nine years afterwards.

Mr. Woodford, attesting witness, although insisting that he never had any doubt about Mr. Holliday's mental soundness, admits that at the time the will was probated he hesitated to answer the county judge's question on that subject until he was sure of the right of the judge to ask it. During these next nine years, Mr. Holliday remained at home, most of the time bedfast. His rheumatic afflictions grew, and he had practically lost use of one leg. He was lame in it even before Milton's death. There is another incident that corroborates the physician who treated him at the time of the marriage. In January, 1909, senile gangrene set up. He was carried to a Lexington hospital and the leg amputated. A hospital physician says: "The gangrene, of course, was

the result of a physical condition produced by the hardening of the arteries and other changes incident to his age." When asked as to his mental condition, he replied: "Well, I can't tell you positively, because the condition of delirium would, to a certain extent, cover that up, and it would be hard to state what his exact mental condition was when he wasn't suffering from this septic absorption—I doubt if he ever knew positively where he was and what had been done to him." Another hospital physician makes an issue here and says: "I thought his mental condition was all right; I saw nothing wrong with his mental condition." He survived the operation, and died in January, 1912, at the age of 86.

True, this is only one side of the case. But that side must be considered to ascertain if there was any evidence to justify an undue influence instruction. As for the other side, there were about an equal number of witnesses, interested and disinterested, who testified that the old man was endowed with strong mental faculties, and that they showed no sign of weakening until the last year or so of his life. The attesting witnesses, the beneficiary, and the attorney who drafted it are positive that the will was written when he had mind and memory sufficient to know his estate, its character and value, as well as his relations and the natural objects of his bounty, and was thoroughly competent to dispose of his estate according to a fixed purpose of his own.

As is said in the Woods case, *supra*:

"The statements, or some of them, made by the witnesses for the contestants, may appear incredible when contrasted with those of the propounders of the will, still the question of fact was one for the jury, and with this conflicting testimony, coming from the lips of many of each side, the jury considered and weighed it, and, it being their province to determine the issues on the facts, we cannot disturb it, if supported by the evidence."

No one of the circumstances taken singly is conclusive that the old man was mentally unsound or that he was a subject of sinister influence. He may have believed it was necessary to shoot his brother, and certainly he had a right to shoot the robbers. Having a competency, he may not have cared to cultivate or manage his farm, and could afford to let the stock run wild. His mental unsoundness is not established by the fact that he discharged Shealey, nor by the fact that he after-

wards compromised the threatened lawsuit, and even later made friends with him. Reaching old age and tiring of bachelorhood, he had a right to marry, although the fact that he waited so long for the first experiment may seem to some a strong presumption against his sound judgment. But counsel do not stress this proposition as if either entertained very settled convictions as to its effect on the question. Anyhow, there is not a suggestion of love or fine sentiment connected with it, and no one claims that the match was made in Heaven. But whether or no, this is not a divorce proceeding, and the validity of the marriage is not in question. It is brought into the case as a circumstance, and, taken in connection with all the other facts, certainly a question is raised as to his capacity to make a will, and his susceptibility to influence. After reading the voluminous record, we cannot say that the jury erred in finding against the will. In fact, the decided weight of the evidence supports the verdict as it seems to us.

The judgment is, therefore, affirmed.