## Moran's Executor v. Moran et al.

(Decided March 21, 1933.)

CHARLES L. DALY and JAMES M. COLLINS for appellant.

B. S. GRANNIS for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

Some of the children of the late Mrs. Mary L. Moran contested her will. Two judgments sustaining the contest were reversed because the evidence did not justify instructions on mental incapacity. Moran's Executor v. Moran, 233 Ky. 526, 26 S. W. (2d) 565, and Moran's Executor v. Moran, 238 Ky. 403, 38 S. W. (2d) 207. The third trial resulted in a hung jury. On the fourth trial the will was again set aside by a verdict, and this appeal is from the judgment rendered thereon. In both of the former appeals it was held that the evidence as to undue influence was sufficient to take the case to the jury, but its sufficiency to sustain the verdict was a question reserved. That is one of the points now being urged for a reversal of this judgment.

A recitation of the facts in the other opinion obviates their presentation here, except upon the immediate issue. This record portrays a woman such as Solomon must have had in mind in his eloquent tribute to a good and virtuous woman, which concludes with these words: "She looketh well to the ways of her household and eateth not the bread of idleness. Her children rise up and call her blessed; her husband also, and he praiseth her." She was a woman of strong character, indomitable energy, and sound business judgment. She was devoted to her family, for whom she sacrificially labored until the end of her days. The relations of the children with each other seem to have been pleasant, with the exception of a growing jealousy between some of them and their brother, Harry. He alone had continued in the home of the mother, and to look after the farm and assist her. The other children had married early, and one by one had established their own households. But it does not appear that the mother was partial to any of her children, or in any material degree favored one in a financial way more than another. There is no substantial evidence of any undue influence being exerted upon her by the contestee, her son, Harry, until a short time before the will was executed and the mother died.

A progressive decline in health led to the visitation by Mrs. Moran to a Cincinnati physician, in company with a son and daughter. Though the information was kept from her, the son and daughter were advised that she had cancer, and could live only two or three months longer. Upon returning, she spent the night of June 4, 1928, with a daughter in Maysville. She was taken

to her home about two miles in the country the next morning in an extremely weak and exhausted condition. There is evidence that upon then being told of his mother's fatal condition, Harry said that all his work was gone, and he didn't know what he was going to do. The next day, Wednesday, notwithstanding her very weak condition, she went to Maysville with Harry. Her daughter, who had remained in the home overnight, noting the preparations being made by her mother to go out, asked what she was going to do, and the mother told her, ''Harry said he can't get those strawberries unless I go''; and, further, ''Mother, as sick as you are, surely a man could go to town and buy two or three baskets of strawberries.'' She said, ''Since he said he can't, I will have to go with him.'' And she did go to town. Mrs. Moran remained in Maysville about four hours upon this occasion, and when she returned she said that she had been sitting in the machine all morning waiting for Harry. It is significant that the stated purpose of going to town, that is, to get some strawberries, was entirely lost sight of. Harry testified that nothing about getting berries was ever said. He left her sitting in the machine without any inquiry as to where she wanted to go. But the attorney who prepared the will in contest testified that it was about that day that Mrs. Moran came to his office alone, and, after consulting with him about securing damages for an injury to her farm by the building of a road, told him she wanted to make a will. He made notes of her wishes with respect to its contents on that day. She appeared to be quite ill at the time, said the lawyer, though she knew exactly what she was doing. Harry denies knowing anything about this visit to the lawyer's office, and says he did not talk to his mother or the attorney about the making of a will.

Ten days later, on Saturday, the 16th, Mrs. Moran told her daughter that Harry wanted her to go to town. She remonstrated with her mother because of her illness, and insisted she ought not to go. She replied, ''He wants me to go and I will have to go.'' The description given of Mrs. Moran's condition at this time was that she was very sick and weak. She and Harry left home about one o'clock. He denies knowing anything of her purpose in going to town that day. And again he says he left her sitting in the car while he went about town. A disinterested witness testified,

however, that he saw Harry that afternoon helping his mother across the street within a short distance of the lawyer's office. It was on this day that Mrs. Moran appeared in his office and executed the will. The attorney called in two gentlemen who were strangers to Mrs. Moran, and the three of them witnessed its execution. The paper was retained by the lawyer at her request. He testified that he did not see Harry during this period, or upon any occasion. Notwithstanding this, and the denial by Harry of any knowledge that his mother had made a will until several days after her death, a disinterested witness relates a conversation with him on the night his mother died, July 4, 1928, which indicates that he did have knowledge of the will and its contents. This conversation is denied by Harry.

During these three weeks between the execution of the will and her death, especially the last few days, Mrs. Moran was in a troubled state of mind about something. She would say to different members of the family that she hadn't done any wrong, and didn't want her children to think she had done so. She appealed to her sister, "Don't let them say I have done wrong." A few days before her death, in response to such a statement, one of the boys said: "Mom, what are you talking about; you know nobody thinks you done wrong." To this she answered, "Harry knows," and asked where he was. He was in the kitchen and was sent for. After a time he came in. We quote from the testimony of the brother:

"He came and sat at the foot of the bed and hung his head and never as much as said, 'Mom, what do you want' or anything, just sat there. I said, 'Harry, it is a dirty shame, as good as our mother has been to all of us, for her to die suffering and to be worried this way. You know what she is worried about, she said you did.' He said, 'I don't know what she is talking about,' and he just stuck his head down, and went out of the room.

"Q. Did you ever find out, while she was alive, what she was worried about? A. That is as far as I know."

His aunt on one occasion asked Harry if he knew what was troubling his mother, and he said he did not.

There is evidence of statements being made from time to time by Mrs. Moran that she wanted her chil-

dren to share equally in what she had, and that she never expected to make a will. On the other hand, there is evidence of an expressed purpose to dispose of her property in her own way, and to take care of Harry for staying with her.

Since the question is the sufficiency of the contestants' evidence to sustain the verdict, it is not necessary that we should review the evidence tending to show that the physical condition of Mrs. Moran during the period involved was not so extreme as that shown by the other side; that the paper expressed the free and genuine will of the testatrix; that the son Harry had nothing to do with its terms or execution; and that the two trips to town were made according to the custom of many years to go there with produce on those days. The evidence was such that a verdict sustaining the will might well have been returned. It is fair to say that the record shows devotion and fidelity on the part of Harry, who secured what, on the face of the will, would seem to be an advantage over his brothers and sisters in the disposition of the mother's estate, and that there was some evidence tending to show that perhaps he was deserving of this advantage.

The law respecting this subject and the test to be applied to evidence regarding undue influence is well settled and needs no repetition. Every case is to be determined by a consideration of its own particular record, and those facts are to be measured by these familiar rules. It has often been said proof of undue influence must sometimes depend upon circumstances from which it may be reasonably deduced. We think the evidence tending to confirm the charge that the will at hand was the result of undue influence on the part of the principal devisee was sufficient to sustain the verdict. Holliday v. Holliday, 161 Ky. 500, 171 S. W. 156; Stege v. Stege's Trustee, 237 Ky. 197, 35 S. W. (2d) 324; Centers v. Jones, 241 Ky. 154, 43 S. W. (2d) 512; Douglas' Ex'r v. Douglas, 235 Ky. 121, 29 S. W. (2d) 637.

The claim that certain remarks and rulings of the trial judge indicated hostility to the appellants' side of the case to their prejudice is not of sufficient merit, in our opinion, to warrant discussion.

The contention is made that the argument of the attorney for the appellees was so highly improper as

to require a reversal of the judgment. The most objectionable part is that he argued the construction and legal effect of the will. Among other things, it was said that ''The Court of Appeals has twice decided that these bequests must be paid out of the personal estate alone''; and that since the debts, etc., would absorb all of the personalty there would be nothing for any of the devisees except the contestee, who would obtain the farm and all of the estate to the exclusion of the other children. It was improper for counsel to refer to the disposition made of the case on the former appeals, or the apparent construction given by this court, for litigants are entitled to a trial on the law and facts presented to them independent of anything outside of that record, as is stated in Illinois Central Railroad Company v. Jolly, 119 Ky. 452, 84 S. W. 330, 27 Ky. Law Rep. 118, in which there had been a reference to a reversal of a former judgment in favor of the plaintiff. That reference, coupled with other statements as to coercion by the railroad company of its employees as witnesses, in part caused a reversal of that judgment. But the association of the statement as to what this court had done in this case, with the facts then being presented to the jury, requires that it be looked at in a different light. It was not coupled with any speech of an inflammatory nature as in the Jolly Case. It is the right of counsel to argue the evidence and express his opinion and construction of it. The will was in evidence, and, as has been said, the instrument is often the best witness for or against itself. If reasonable, just, and natural, it tends to establish capacity in the testator and to prove that it was freely and voluntarily made. If unnatural, inconsistent, or unjust in the disposition of the estate among the natural objects of testator's bounty, it tends to prove the contrary. Newcomb's Ex'r v. Newcomb, 96 Ky. 122, 27 S. W. 997, 16 Ky. Law Rep. 376; Cecil's Ex'rs v. Anhier, 176 Ky. 198, 195 S. W. 837, 842; Walls v. Walls (Ky.) 99 S. W. 970, 30 Ky. Law Rep. 948; Lisle v. Couchman, 146 Ky. 345, 142 S. W. 1023, 1031; Mossbarger v. Mossbarger's Adm'x, 230 Ky. 230, 18 S. W. (2d) 997. Compare Ligon v. Osborn, 155 Ky. 328, 159 S. W. 801.

Learned argument is made in briefs as to the correctness of the construction of this will as given to the jury by counsel, the reason for which is to show that his interpretation was proper, hence his presentation

was legitimate; and on the other hand that it was not proper, and that if the will were sustained Harry would have to pay the other devisees in all events, and would really receive no more in the end than his brothers and sisters, hence that the argument was prejudicial. In reciting the terms of the will in a general way in the two former opinions in this case, it was indicated that the bequests to others than Harry were payable out of the personal estate, but there was no purpose or intention to construe the will as that matter was not before us. It must be conceded that the will is difficult of interpretation in those respects. Because of the ambiguity, we think counsel was authorized to give his construction of the will under the rule which permits argument of evidence, its reasonable meaning, probative value, and other interpretations which may be put upon it.

We are of the opinion, therefore, that the judgment should be, and it is, affirmed.

Whole court sitting, except Rees, J.