## Hopkins et al. v. Taylor et al.

(Decided Feb. 27, 1934.)

MARTIN T. KELLY and J. H. TAYLOR for appellants.

N. R. PATTERSON and E. B. WILSON for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The widow, for herself and child, was successful in contesting the will of Steve S. Taylor of Pineville. His sister and two brothers, who are beneficiaries and contestees, seek a reversal of the judgment principally upon the ground that the verdict finding the instrument not to be a will is flagrantly against the evidence.

The deceased was a barber employed for many years in his brother's shop. At one time he owned the business and his brother worked for him. Practically all of his estate of about $8,000 was the product of his own industry. He was devoted to his wife and idolized his little girl, who was four years old. He had six brothers and sisters. Lee Taylor, the brother by whom he was employed, lived across the street, and they were always on very intimate terms. It does not appear where the sister Mrs. Lula T. Hopkins lived. T. J. Taylor lived in Appalachia, Va., but had been in Pineville for two weeks before November 16th helping to nurse his brother, as he testified. The general effect of the will under attack was to give a life estate or defeasible fee in practically all the property first to his widow with the remainder to the child for her life, and then the ultimate remainder to this sister and these two brothers.

We shall merely give an outline of the evidence as it would seem sufficient for the opinion.

In the early part of September, 1932, Taylor was taken ill and gradually grew worse. He was afflicted with leakage of the heart and Bright's disease and had a very high blood pressure. After the first of October, he was frequently delirious, and towards the latter part of his life was kept under the influence of narcotics in order to relieve his great pain and suffering. The will was signed on November 8th, and he died on November 27th. His condition was such that visitors were not generally admitted. The Reverend Mr. Kelly, pastor of the First Baptist Church, testified that during his several calls in November he regarded the sick man as rational,

144

but he talked but little and did not seem normal and he was greatly incapacitated by pain and disturbed by the knowledge that he was soon going to die. In his opinion Taylor would not have been capable to make a will. There are some other lay witnesses who testified to the same effect. A groceryman and a garageman in business near the home each testified to having heard the sick man's groaning and hollering; particularly did they remember that he did so on the day the will was written, which was election day, and while Dr. Stacey was in the house.

His physician, Dr. Wilson, gave a detailed description of his patient's condition, as to the nature of the diseases, the shortness of breath, swelling of his feet and legs, his expectorating of blood, and his general toxic condition. He had administered to him hyoscin, codine, and barbatal, or veronal. These narcotics had been administered for ten days or two weeks before the will was signed. Codine and hyoscin created what is sometimes called "twilight sleep," and have the effect of dethroning reason and the realization of one's surroundings. Without this to quiet him, Taylor would groan and holler practically all the time. On the evening of November 8th, when the doctor called, Taylor was worse and in a very bad condition. The doctor gave his professional opinion that he was not able to make a will according to the usual standards. Dr. Shultz, Dr. Combs, and Dr. Ramsey, upon hypothetical questions, gave the same opinion.

On the day the will was written, Taylor's sister Mrs. Hopkins and her husband went to the office of a lawyer, W. J. Stone, with a memorandum of a will, and had him prepare it accordingly. Mrs. Hopkins testified that this was done at her brother's request and that the notes reflected his expressed wishes. During the preparation of the paper a difference arose between Mrs. Hopkins and her husband as to the disposition of certain property, so, as they testified, they went back and consulted Taylor. That afternoon they returned to the lawyer's office when he completed the document. They then took him to Taylor's home to have it executed. Mr. Stone testified that Taylor was sitting up in bed and read the will and then he (Stone) read it aloud to him. He called Taylor's attention to what he regarded a rather peculiar disposition of the estate, i. e., as to its general effect, but Taylor responded that it was just as

he wanted it. Dr. Stacey and Mr. Hopkins were present. He did not notice whether Mrs. Hopkins was around. Dr. Stacey, who had never visited Taylor professionally, was asked that afternoon by Hopkins to go and examine him in order to see whether he was capable of making a will. He went with Hopkins and his wife for that purpose about 2 o'clock in the afternoon. Both of them were present, but the sick man's wife and child were not. Mrs. Hopkins, however, testified that she was not there when the will was signed, but met Dr. Stacey on the steps as he was going in. Dr. Stacey asked the patient some questions and took his blood pressure. He testified that he seemed normal. It is quite significant, we think, that he was not asked the formal comprehensive question concerning testamentary capacity, although he did testify that he regarded the sick man as able to understand what he was doing about making a will. Upon cross-examination Dr. Stacey agreed with Dr. Wilson as to the effect of the several drugs which had been given the patient. There are several witnesses who testified that at this time Taylor could not see how to read, if for no other reason than that his little girl had broken his glasses. The ultimate beneficiaries, Lee Taylor, Mrs. Hopkins, and T. J. Taylor, were at their brother's home a great deal of the time, assisting in caring for him, but they testify that none of them were present when the will was signed. Mr. Stone testified Lee Taylor may have talked with him about his brother wanting to make a will, but Lee stated he did not remember it if he had. It appears that on this day Dr. Wilson, the regular physician, had been called out of Pineville to treat some men who had been shot in an election day fight. He had not called during the day and Taylor asked his wife to go get him. It is not clear how it came about, but Lee Taylor took the wife to the doctor's office in his automobile. He says she called and asked him to do so, but she denies it. They also went to the office of Dr. Ramsey, who had visited Taylor once, to inquire what he thought of his condition. It was during this absence of the wife that Mrs. Hopkins and her husband were having the will prepared and signed.

The contestees and several lay witnesses who had called from time to time testified that they saw nothing wrong with Taylor's mental condition and regarded him as of sound mind. The evidence of two or three of

146

these witnesses was weakened oy proof of contradictory statements. To none of them, however, was propounded the usual question as to the testamentary capacity. But Rev. J. A. McCord was asked it upon cross-examination and replied: "From the nature and advanced degree of the affliction I would not think so." Dr. Nuckols called on the patient, in company with Dr. Wilson, early in October and again early in November. He testified that Taylor seemed to answer rationally and in the ordinary way the few questions asked him concerning his symptoms and condition. When asked as to his testamentary capacity, the doctor would only answer that he noticed no depression of mind or anything abnormal about his mental condition.

In addition to the foregoing, the widow testified that about the first of September her husband told her that he wanted to make a will so nobody could beat her and the baby out of what he had. A witness introduced by the contestees testified that about a year before Taylor had told him that, if he had anything left, he was going to leave it to his wife and child. T. J. Taylor testified that when his brother's wife came in about 6 o'clock in the evening when the will was signed, Taylor asked her where in the world she had been; told her that she had stayed all day and came near staying all night. She answered that she got back as soon as she could, and he told her: "You should have been here— I made my will." She responded: "You have." And he said: "Yes, I have taken care of you and the baby," and she answered: "That is all right, anything you do suits me." His brother-in-law, Ben Hopkins, was standing at the bedside and Taylor told his wife: "Ben has got it and you can read it," and she replied: "It is all right, I have not got time right now." Mrs. Taylor emphatically contradicts all of this and testified that she did not know anything about the will until a week after her husband's death.

It may be that we have omitted some parts of the story, but this recitation, we believe, is sufficient to demonstrate that the verdict is not flagrantly against the evidence; rather that it fully supports the finding of the jury. We have an unnatural disposition of the property, and overwhelming evidence of facts and opinions by laymen and doctors that the man was irrational and delirious practically all the time for a week or more before the will was executed, and at the very time the

will was being signed he was screaming so as to be heard several hundred feet from the house. We have evidence of the destructive effects on the mind of the narcotics necessarily administered to quiet him. There is much general and specific evidence of incapacity on the part of the deceased to know his estate, to know the natural objects of his bounty, and appreciate his duty to them and to dispose of his estate according to fixed purposes of his own. The evidence to the contrary is rather weak. In addition to this evidence of mental incapacity, we have the circumstances under which the will was written and executed. There is the actual participation of two of the principal beneficiaries, one busily engaged in having the will written and executed, while the other had the testator's wife, in her distress, under his watchful care out calling upon the doctors. The case is ruled by that line of precedents holding the evidence sufficient to sustain the verdict of no will. Stanley v. Wentworth, 205 Ky. 108, 265 S. W. 470; Hagedorn v. Scott, 228 Ky. 582, 15 S. W. (2d) 479; Douglas' Ex'r v. Douglas, 235 Ky. 121, 29 S. W. (2d) 637; Moran's Ex'r v. Moran, 248 Ky. 554, 59 S. W. (2d) 7.

It is argued that the court erroneously permitted contestants, through the form of interrogation and argument, to lead the jury to believe that the will took from the wife and child all of the property for the benefit of the brothers and sisters of the dead man. Our attention is not directed to any particular instance of this character, and we have observed none that appears to be prejudicially improper. As is pointed out in Moran's Ex'r v. Moran, supra, the will is often the best witness for or against itself. If reasonable, just, and natural, it tends to establish capacity and to prove that it was freely and voluntarily made. If unnatural, inconsistent, or unjust in the disposition of the estate, it tends to prove the contrary. It was held in that case that it was not improper for counsel to argue their construction of the will. Perhaps some of the questions asked on this trial in this regard, which sought interpretation of the paper by the witnesses, were improper, but in the main they were directed to the widow in order to justify her action in contesting the will by reason of her understanding of its effect. For that purpose we think the evidence was competent. The other testimony along this line was so little as not to be prejudicial.

Upon the authority of Thompson v. Thompson, 134 Ky. 757, 121 S. W. 641, it is argued that the widow was not a proper contestant, for if not satisfied with the terms of her husband's will, her remedy was to renounce it as is provided by section 1404 of the Statutes. The only pleading which could be regarded as raising this question is a special demurrer upon the specified ground that the court did not have jurisdiction of the parties or subject-matter. Section 92 of the Civil Code of Practice stipulates that the question of legal capacity to sue may be raised by special demurrer, and, unless it is distinctly specified, the defect of parties will be deemed to have been waived. The same question was presented in Husband v. Cotton, 171 Ky. 177, 188 S. W. 380, L. R. A. 1917A, 1150, and it was held that where the special demurrer raised only the question of jurisdiction, the matter of defect of parties was not raised and the special demurrer was properly overruled because the court clearly had jurisdiction of the subject-matter. But other than this technical condition of the record, the widow, as guardian of the alleged testator's child, had the right to maintain the contest and the failure to have the widow individually made a party contestee did not affect the case.

The judgment is affirmed.