## Osborn et al. v. Paul et al.

(Decided March 18, 1938.)

ERLE McGUFFEY and FRANK S. GINOCCHIO for appellants.
ELMER DRAKE and N. E. FREY for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On December 28, 1933, Fred Paul died testate, a resident of Lexington, Ky. He was in his fortieth year. Four years prior thereto he was divorced from his then wife, the next friend appellee, Norma Meade Paul, to whom he was married about the year 1925. Before that divorce there was born to him and his wife the appellee, Freddie Lucille Paul, who was some 3 years of age at the time the divorce was granted, and she was the only issue of the marriage. By some mutual arrangement the child was legally adopted by her grandmother, the mother of testator, and from thence forward she resided in the home of her grandmother, which was also at that time the home of her father, the testator—the members of that family then being testator, his mother, and his daughter, whom his mother, as we have stated, had adopted. Testator's mother died intestate on October 17, 1932, slightly more than 14 months before his death.

About 1893 or 1894 the appellant, Nannie Bell Osborn, who was then some 8 or 9 years old, was made an orphan by the death of her parents. They, with their daughter, lived on adjoining lots with the mother of Fred Paul, or near her residence, and she, having taken a liking to the child, agreed to and did take her into her home, where she lived until 1902, about a year before she married in 1903, when she left Mrs. Paul's residence and took up her abode in another part of the city of

Lexington, and procured employment by which she could be supported. She married the next year her present husband, William B. Osborn, who then lived in Covington, Ky., and from thence forward Mrs. Osborn resided either in Covington or some of the cities surrounding it, though she continued thereafter to visit her foster mother, Mrs. Paul, upon occasions, possibly upon an average of once per month.

Mrs. Paul, the mother of Fred, left, as her only heirs, her son and his daughter, and, having executed no will, her property under the law of descent and distribution went to them in equal parts. It consisted mostly in real estate, and its value in the aggregate was something like $18,000, the real estate being the residence where Mrs. Paul lived at the time of her death, with some other cheaper ones in the city of Lexington which she rented. For some 10 years or more prior to his mother's death the testator, Fred Paul, had excessively consumed alcoholic beverages until he had become, as disclosed by the testimony, a confirmed inebriate—being more or less intoxicated practically all the time, with only occasional glimmering periods of complete soberness; but which lasted but a short while and during which he was extremely nervous and which, according to the testimony, was both physical and mental. The recitation of the testimony as to his acts and doings throughout that period—and possibly longer—could serve no useful purpose. Suffice it to say that it discloses that he was at times extremely cruel to his mother, both before and after his wife divorced him for cruel and inhuman treatment in 1929, and his attitude and conduct towards his wife before the divorce was of a similar character. He was frequently in jail for being drunk, was sometimes sent to the hospital, and in the early part of November, 1932, shortly after his mother's death, he was placed in a sanitarium, which the evidence clearly discloses was for inebriety, where he stayed for some days and was discharged on November 6 of that year, just 4 days before he executed his will, which is the subject matter of this litigation.

In his will he directed his debts, including funeral expenses, to be paid, and then devised all of his property of every kind and character to the appellant, Nannie Bell Osborn, not even mentioning his daughter's name anywhere in it. He appointed Mrs. Osborn execu-

trix of the will and required that no surety be required of her, nor that she should make any inventory of his estate. It was probated in due time in the Fayette county court, followed by an appeal therefrom by his infant daughter by her mother as next friend, to the Fayette circuit court—upon the grounds of undue influence exercised over the testator, and of his lack of mental capacity at the time the will was made. At the trial in that court the jury returned this verdict, signed by nine of its members: "We, the following jurors find that Fred Paul was not of sound mind, and that the paper mentioned in the evidence is not the Last Will and Testament of Fred Paul, deceased." Judgment was pronounced accordingly, from which contestees prosecute this appeal. The sole ground argued in brief of learned counsel for appellants is: (1) That the verdict is not sustained by the evidence, and that their clients' motion for a peremptory instruction directing a verdict sustaining the will at the close of appellees' testimony and made at the close of all the testimony should have been sustained; but, if mistaken in that, then (2) that the verdict is flagrantly against the evidence.

It was manifested by the testimony that on October 21, 1932, just one week after the death of testator's mother, he made application to the county court of Fayette county requesting that Mr. Osborn be appointed administrator of his mother's estate, and on the same day he made a similar request that he also be appointed statutory guardian for testator's daughter. Those requests were sustained, and Mr. Osborn was appointed and qualified as such fiduciaries, and continued thereafter to act as such. In such request the testator relinquished his superior right to do so. On the 26th day of November 1932—1 month and 5 days after testator had relinquished his right to administer upon his mother's estate, and to act as guardian for his daughter, and 1 month and 12 days after the death of his mother—he executed a general power of attorney to Mrs. Osborn authorizing and empowering her in his name to take charge of and manage all of his property of every kind and description with as unlimited authority over it as he possessed as its owner. Shortly after that he made a trip to Florida, where he remained for some time, returning to Lexington, and later died on the date indicated by falling down a stairway, receiving injuries producing his death.

The case has been ably and, as we are convinced, fairly briefed by both sides, and which has greatly assisted us in arriving at the conclusion that the verdict of the jury should not be disturbed, and that the judgment should be affirmed. Learned counsel for appellants (contestees) strenuously contend, although confessing the inebriety of the testator, that he, nevertheless, executed his will during a lucid interval when he was duly sober and was mentally qualified, according to the standards of the law, to do so. Likewise, with equal emphasis they insist that there was no evidence of undue influence, and that it as a ground of contest was eliminated from the case by the verdict of the jury when it said that decedent "was not of sound mind," which, of course, was necessarily directed to the time when he executed his will. Counsel construe the verdict as tantamount to saying that the jury found that no undue influence was exercised upon him. However, there is at least room for doubting the correctness of that interpretation, since the verdict further states "that the paper mentioned in the evidence is not the last Will and Testament of Fred Paul, deceased."

However, we do not regard it as important or necessary to the determination of this appeal for us to attempt to construe the verdict the one way or the other upon the issue of undue influence, except to say that the record is not altogether barren of testimony strongly indicating its exercise, either by Mrs. Osborn or her husband, since they were not only on exceedingly friendly terms with the testator, but were frequently with him from and after the time of the death of his mother and culminating in them—in the one capacity or the other—becoming possessors and managers of all the property of Mrs. Paul, testator's mother, the wife becoming the general attorney in fact of the testator's half with the powers hereinbefore pointed out, and the husband having charge as administrator and as guardian of testator's daughter of all of the rest of Mrs. Paul's property. They also visited the office of attorneys with the testator and were frequently in company with him when no others were present. It is also shown by the record that both of the Osborns, as well as testator (they being given that information by him), were under the impression that Mrs. Paul had left a will in which she had distributed her property equally

between the three, i. e., testator, his daughter, and Mrs. Osborn. However, they discovered within less than a week after the death of Mrs. Paul that she had left no will. Immediately after that discovery the will in contest was executed, in which the testator by executing it divided his mother's property equally between his own daughter and his foster sister, Mrs. Osborn, whose husband appears to own more or less property and has a good position with a lumber company in the city wherein they reside.

There is and could be no dispute as to the law applicable to such issues (i. e., legal mental capacity to make a will, and undue influence entering into its execution), and counsel are in accord with the declarations of this and other courts upon such matters. Consequently, each of them cite many of our prior cases, together with some foreign ones, in an effort to bolster their respective contentions, appellants' counsel insisting that at the particular time the testator executed his will he was enjoying a sufficient lucid interval for his mental capacity to measure up to legal requirements; whilst learned counsel for appellees and contestants contend that testator's mental condition at the time the will in contest was executed—though he may at the time have appeared to the casual observer to be mentally sound— was nevertheless so weakened, as was also true of his body, as that his mind had become clouded and muddy to the extent that he did not have mental power sufficient to execute a will as measured by the standards of law necessary therefor.

The will was prepared in the office of Mr. Erle McGuffy, who likewise prepared the prior relinquishment papers executed by testator and to which we have referred. Either on the day the will was prepared or some few days prior thereto Mr. McGuffy said that testator had asked him where his property would go in case he executed no will, and he was informed that it would be inherited by his infant daughter. He then sought information from the attorney as to where it would go in case his daughter died, and was correctly informed by the attorney as to who would inherit it, which, of course, was according to our statute of descent and distribution, and that he expressed a desire that his divorced widow should not obtain any of his property in any event. It is stoutly argued that the reason, so

assigned as motivating the testator in making his foster sister his sole devisee, is strong evidence of his sufficient mental capacity. But we do not evaluate the force of that argument, as giving to the circumstance the weight attributed to it by counsel, since any eventual vesting of title in the divorced widow could have easily been provided against in the will of Fred Paul, without entirely disinheriting his infant daughter to whom, so far as this record shows, he was as much attached as a person in his condition could well be. In that easy and simple manner this cogently appraised reason, put forward by learned counsel in explanation of the more or less unnatural will, at once disappears.

An examination of the authorities discloses that—more particularly, perhaps, in will contests than any other kind of litigation—each case is determinable upon its own facts. The reason for which is, that human nature is moved by a great variety of incidents and circumstances, and no two cases are alike—the main facts in all of them being whether or not the one executing the will in contest was or not at the time sufficiently mentally capacitated to do so, or whether or not he was induced to do so by forbidden undue influence. Therefore, necessarily, the testimony on both such issues always and necessarily assumes a broad scope involving inquiry into related facts bearing upon the principal and material ones under consideration. We have written many cases wherein we have disallowed trifling circumstances, with departures from normal ones—and occurring at the particular times and stages of age of the testator—to overthrow a solemnly executed will, and wherein we have approved a directed verdict in favor of the will where there was no other or additional substantial testimony, of probative weight, indicating a want of capacity on the part of the testator. Perhaps the most outstanding case in that class of our opinions is the recent one of Dossenbach v. Reidhar's Ex'x, 245 Ky.449, 53 S.W.(2d)731, which is among the cases cited by counsel for both sides to this controversy. But neither in that case, nor in any other one of the same class, had the testator engaged in any habit or indulgence to the extent as to necessarily whet away, blunt, and gradually destroy both his mental and physical being, whereby the former becomes permanently distorted so as that he views the realities of life through mentally

smoked glasses. Such a one, according to the testimony in this case—which coincides with scientific facts, of which we possibly might take judicial knowledge—may for momentary periods appear to be normal, and, by remaining quiet and practically silent, sparingly engaging in conversation, appear to the casual observer, and infrequent associate, to be in a mentally normal condition; but at the same time an investigation into the true state of facts would reveal a different condition. All of the cases dealing with similar situations are to that effect and none are cited or found to the contrary.

The proof as to the general conduct of the testator in this case, extending back at least ten years prior to his death, discloses most abnormal action such as could be prompted by only the mind of either a moron, or the mind of one, though once intelligent, has become clearly impaired by the consuming effects of continuous excessive use of intoxicants. It is clear that the testator did not belong to the first class (moron) and, to our minds, it is equally as manifest that he did align himself voluntarily with the second one. For years he not only quarreled with his aged, patient, and forgiving mother, but he would sometimes strike her, and he pursued the same course towards his wife; and he would in addition thereto also engage in most extreme abnormal conduct, sometimes, appearing before company in a perfectly nude condition, and going about through the residence that he occupied in the same condition. The effects of the continued use of alcohol had become so great, both on his mind and his nervous system, that he was sent to a sanitarium some 10 days before he executed his will, where he remained for nearly a week, and executed his will 4 days after leaving that institution. Its physician manager testified as to the condition of his mind at that time, and many other witnesses testified to its condition at periods slightly more removed from the date of the execution of the will, but sufficiently near thereto as to create the belief that his mind throughout that period was so alcoholically diseased as to reduce its level, in his occasionally lucid intervals, below that which is requisite to execute a will according to the standards erected by law, and such was their testimony.

Counsel for both sides cite the case of Holliday v. Holliday, 161 Ky. 500, 171 S. W. 156, in which not only

the question of the use of alcohol by the testator is dealt with, but likewise in that case the principles we have hereinbefore advanced are expressly recognized as to the scope of the testimony permissible in such contests. The jury found in that case the involved paper not to be the will of the testator, and the judgment pronounced thereon was affirmed by this court. It was not shown that he consumed alcohol to the extent that Fred Paul is proven to have done in this case, nor did the resultant acts and conduct of the testator in that case go to the extent of those proven to have been indulged in by the instant testator. We upheld, as stated, the verdict of the jury in that case and said—as had been done in many cases prior thereto, and many since then—that the scintilla rule applied in will contest cases the same as in others, except that we have, as is pointed out in the Dossenbach Case, supra, raised what might be said to be the character of proof necessary to create a scintilla in will contest cases.

A case in which we upheld the verdict rejecting the will in contest as having been executed by the testator without sufficient mental capacity is Duval v. Duval, 249 Ky. 186, 60 S. W. (2d) 351, 353, in which the want of mental incapacity was largely supported by the fact of excessive use of intoxicating liquor by the testator, and in which we said: "On the question of mental incapacity, it is shown by a number of witnesses for appellees that for many years prior to his death Mr. Duval had been a constant drinker of alcoholic liquor, and there is much evidence to indicate that he often drank to the extent of intoxication." Other late cases substantiating the rules hereinbefore stated are Moran's Ex'r v. Moran, 248 Ky. 554, 59 S. W. (2d) 7; Woodruff's Ex'r v. Woodruff, 233 Ky. 744, 26 S. W. (2d) 751, and a great number of others therein cited.

It will furthermore be observed that in this case, as we have hereinbefore stated, the will of testator never mentioned his infant daughter and, therefore, gave no reason why he disinherited her—except, perhaps, in giving the reason why he made Mrs. Osborn his sole devisee and legatee. That reason was the service rendered him by Mrs. Osborn "in the management of my estate which I inherited from my mother," when the fact was and is that such assistance was pursuant to the power of attorney that testator had recently given her,

and for which she made a charge of $195. Such circumstances, as we have hereinbefore related, together with many others appearing throughout the record as a whole, clearly sustain the verdict of the jury in finding that the testator was not mentally capacitated to execute the will at the time he attempted to do so, and for which reason we are wihout authority—as pointed out in the cases cited, as well as in others referred to in them—to disturb it.

Wherefore, the judgment is affirmed.