## Karr v. Karr's Ex'r.

May 31, 1940.

Charles C. Marshall, Judge.

J. F. Thomas, Leslie W. Morris and Marion Rider for appellant.
Turner & Rouse for appellee.

Opinion of the Court by Judge Fulton—Affirming.

On a contest of the will of F. M. Karr the trial court submitted the case to the jury on the issue of mental capacity alone, refusing an instruction on undue influence offered by appellant, and the jury found in favor of the will. From a judgment entered pursuant to the verdict this appeal is prosecuted and the sole ground of reversal relied on is that the trial court erred in refusing to submit to the jury the issue of undue influence.

The testator, a man 75 years of age, was a substantial and respected resident of Eminence and had accumulated a personal estate of approimately $22,000 and also owned a farm and residence, the real estate also being worth approximately $22,000. He was stricken with acute appendicitis on January 26, 1938, and was taken to St. Joseph's Infirmary in Louisville the next day where he was operated on, on Friday, January 28, by Dr. Irvin Abell, the operation revealing that his appendix had ruptured. His death occurred on the following Wednesday and his condition and medical treatment, including the amount of opiates administered, between the time of the operation and his death appear to have been such as would ordinarily be expected following operations of this character resulting in death.

The testator's wife had been dead for some years and he had no children but was survived by a brother, the appellant, Henry Brewster Karr, and another brother, G. M. Karr, both of whom were past 70 years of age. The appellant had lived out of the state of Kentucky for forty-seven years and had not seen the testator for fifteen years. G. M. Karr had lived out of the state the larger part of his life and had not seen the testator for forty-four years. The testator for many years had been most intimate with the appellee, R. C. Ricketts, and his family, and following his wife's death some years ago resided with this family. R. C. Ricketts had two sons, Frank Karr Ricketts and Wilson Ricketts, the former being a namesake of the testator.

Mr. and Mrs. Ricketts were called to the testator's home when he was taken ill and although the local physi-

cian had made arrangements for the testator to be taken to St. Anthony's Hospital and be operated on there, these arrangements were changed after Mr. and Mrs. Ricketts consulted with the testator. This is one of the circumstances relied on by appellant as indicating a degree of control over the testator by the Ricketts family. Before starting for the hospital Frank Karr Ricketts, who lived in Louisville, was called by Mr. and Mrs. Ricketts and he made the arrangements for testator to be taken to St. Joseph's Infirmary. Mr. and Mrs. Ricketts accompanied the testator to the hospital in the ambulance and were met there by Frank Karr Ricketts, who continued to remain with the testator almost every moment from that time until testator's death. Mr. and Mrs. Ricketts did not remain at the hospital the entire time but returned home and made several visits to see the testator.

On Sunday morning, following the operation, the testator notified Dr. Abell that he desired to make a will and would like to see a lawyer for that purpose. Dr. Abell thereupon suggested his son who came to the hospital and prepared the will in controversy. Both R. C. Ricketts and Frank Karr Ricketts testify that the testator had previously told them that he was going to make a will and just how he would dispose of his property. William H. Abell, who wrote the will, states that when he started to talk to the testator about the will Frank Karr Ricketts got up to leave the room but was requested by the testator not to do so. He states that the testator had a comprehensive grasp of just what property he owned and what he wanted to do with it and that after receiving the necessary information from the testator he went out in the corridor of the hospital to write the will but before he had completed it he was sent for and the testator informed him that he had omitted to tell him to put in a bequest of $500 to Wilson Ricketts. He thereupon completed the writing of the will by which the testator devised his real estate to his two brothers and made bequests of $2,000 to Frank Ricketts and his wife, $1,000 to R. C. Ricketts and his wife, $500 to Wilson Ricketts and his wife and $1,000 to Mrs. Lucille Hornsby of Eminence and further provided that the residue of his personal estate should go to R. C. Ricketts and wife and to Frank Ricketts and his wife. The Ricketts family thereby became devisees of all the personal

estate except $1,000. The will also contained a provision that if the personal property was not sufficient to pay the bequests then the legatees should share proportionately. This latter provision of the will is a circumstance relied on by appellant as indicating the testator's lack of comprehension of his estate since he possessed far more personal property than the bequests amounted to. Mr. Abell explains, however, that he was responsible for this provision as it was his custom to put such a provision in wills written by him.

Dr. Abell and William H. Abell testify that the testator's mind was perfectly normal on Sunday morning as does the professional nurse on duty at that time. This nurse and the other two nurses who were in attendance on the testator testify that during the entire time up to a short period before his death the testator's mind was perfectly normal. Certain physicians, to whom the hospital chart kept by the nurses was read, state that in their opinion the testator's mind was normal on Sunday morning while other physicians, introduced by appellant, testify from the entries on the chart that in their judgment the testator was incapable of comprehending the nature and character of his estate and disposing of it according to a fixed purpose of his own. These latter physicians also testify that the testator was in a condition to be easily influenced as a result of the pain he was undergoing and the opiates administered to him.

Two witnesses for appellant, Tom Middleton and his wife, who were intimate friends of the testator, testify as to separate conversations with the testator a year or so before his death in which he told them that he expected his brothers to have whatever property he owned, while Dr. A. G. Elliston, a life-long and very intimate friend, testified that the testator, about two years prior to his death, talked with him as to his affection for the Ricketts family and said that he expected to take care of them handsomely. Mrs. J. P. Turner testified that on one occasion she had a conversation with the testator in which she told him that she thought he ought to make a will and in reply he said, "I have always said that I would never make a will."

Appellant's counsel in the brief lay considerable stress on the fact that Frank Karr Ricketts, who took

charge of the situation at the hospital, told the hospital authorities that the testator had no relatives and that he was the responsible party to be notified. We attach little importance to this evidence because it was elicited from Frank Karr Ricketts on cross-examination and he merely testified that he told the hospital authorities that the testator had no relatives at home. This action seems perfectly natural in view of the fact that the two brothers resided, one in Oregon and one in Mexico.

As a circumstance indicating undue influence it is further argued by appellant's counsel that persons were denied access to the testator by the Ricketts family. We think there is little basis for this argument as the only testimony along this line was furnished by Mrs. Albert Black, who stated that when she and her husband went to the hospital on Sunday morning to see the testator that "Mr. Ricketts held us out of the room for a short time." The testimoy of Mrs. Black's husband reveals, however, that they did see the testator on Sunday morning before the will was written. In any event there was nothing unusual or out of the way in persons being kept from the testator's room for a short time. We know as a matter of common knowledge that visitors at hospitals are thus frequently required to wait a short time before seeing a patient.

The evidence on which appellant's counsel lay the greatest stress as entitling them to have the case submitted to the jury on undue influence is the testimony of the professional nurse in attendance on the testator on Sunday morning when the will was written. This witness stated on cross examination that after the making of the will and "after the people had left" the testator said "It looks like they are trying to get everything I have away from me," and the witness then qualified her testimony by saying, "But you know I couldn't tell whether he was joking or serious." In our opinion this is the only evidence in the case that even remotely squints at the exercise of undue influence over the testator. It is true that the proof showed ample opportunity on the part of Frank Karr Ricketts to exercise such undue influence since he candidly admitted that he was with the testator at every possible moment during all the time he was in the hospital. However, it is the well established rule that a mere opportunity to exercise undue influence is not in itself proof that it was exercised.

Parks v. Moore's Ex'r, 265 Ky. 678, 97 S. W. (2d) 579; Clore et al. v. Argue et al., 213 Ky. 664, 281 S. W. 1005. And it is further true that appellant's proof by physicians is to the effect that the testator was in a condition in which he could be easily influenced but neither is proof of this character any evidence in itself that undue influence was actually exercised. The statement made by the testator to the nurse, which the nurse did not know whether seriously or jokingly made, does not appear to us to be sufficiently definite, even when considered with the evidence previously mentioned, to have warranted a submission of the case on the issue of undue influence. In the first place there was no definite reference by the testator as to whom he was referring and as to what he meant by the statement. This witness did not say that the testator was referring to the will or that it was mentioned by him. In the second place, though it be conceded that the testator was referring to the Ricketts family and the execution of the will, it would be only a surmise to say that he had in mind, or was referring to, any efforts on their part to procure him to execute a will by influence exerted on him other than such influence as was legitimate, such as reasonable influence acquired by kindness, good treatment and affection.

It might with reason be argued that this statement, accompanied by other evidence introduced for appellant, constituted a bare scintilla of evidence which would have required a submission of the case to the jury on the issue of undue influence prior to the decision in Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. (2d) 877. Under the rule announced in that case, however, it was the duty of the trial court to submit the case to the jury only if the evidence was sufficient to sustain a verdict against the will on this issue. After a careful examination of all the testimony, the substance of which we have stated above, we have reached the conclusion that if the case had been submitted to the jury on the issue of undue influence and a verdict made against the will on that ground we would have been constrained to hold that the verdict was flagrantly against the evidence. This being true, it follows that the trial court committed no error in refusing to instruct the jury on undue influence.

Judgment affirmed.