RENDERED: MAY 2, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0444-MR

SUZANNE RANDAL DAUES                                    APPELLANT
(FORMERLY KNOWN AS MARY
SUZANNE DAUES)


APPEAL FROM WOODFORD CIRCUIT COURT
v.        HONORABLE JEREMY MICHAEL MATTOX, JUDGE
ACTION NO. 19-CI-00339


BAILEY FOSTER, INDIVIDUALLY
AND AS BENEFICIARY OF THE
RANDAL FAMILY TRUST;
MEGHAN RANDAL,
INDIVIDUALLY AND AS
BENEFICIARY OF THE RANDAL
FAMILY TRUST; ROBERT KEVIN
RANDAL, EXECUTOR OF THE
ESTATE OF MARYLYN RANDAL
AND THE ESTATE OF MARYLYN
RANDAL; ROBERT KEVIN
RANDAL, EXECUTOR OF THE
ESTATE OF R. DAVID RANDAL
AND THE ESTATE OF R. DAVID
RANDAL; ROBERT KEVIN
RANDAL, INDIVIDUALLY AND AS
BENEFICIARY AND TRUSTEE OF
THE RANDAL FAMILY TRUST;
AND STEVEN COLBURN, TRUSTEE
OF THE RANDAL FAMILY TRUST                              APPELLEES

OPINION
AFFIRMING IN PART, REVERSING IN PART,
AND REMANDING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; A. JONES AND LAMBERT, JUDGES.

JONES, A., JUDGE: This appeal concerns claims by Appellant, Suzanne Randal Daues ("Suzanne"), to an equal share of the remainder of the Randal Family Trust based on an alleged oral agreement to equalize the Trust, or, in the alternative, to no less than $1 million from the Trust based on alleged undue influence by her brother, Kevin Randal, and the lack of capacity of her mother, Marylyn Randal, to execute documents in January 2017.

Having reviewed the record and being otherwise sufficiently advised, we affirm the trial court's decision granting summary judgment to Appellees on the alleged oral agreement; affirm the trial court's rulings limiting discovery of certain of Marylyn Randal's legal, financial, and medical records; reverse the trial court's exclusion of Appellant's expert, Dr. Walter Butler; reverse the grant of summary judgment to Appellees on Appellant's lack of capacity and undue influence claims; and remand this matter to the Woodford Circuit Court for further proceedings consistent with this Opinion.

-2-

# I. BACKGROUND[1]

During their marriage, R. David Randal ("David") and Marylyn A. Randal ("Marylyn") had three children:  Suzanne, Robert Kevin Randal ("Kevin"), and Patrick Alexander Randal ("Alex").  On July 11, 2006, David and Marylyn established the Randal Family Trust ("Trust") in Rancho Santa Fe, California.[2] (Record (R.) at 24-64.)  As originally executed, the Trust provided that, upon the deaths of both David and Marylyn, the Trust's assets would be distributed equally among their three children.[3]  However, on October 13, 2009, David and Marylyn executed an amendment to the Trust ("2009 Amendment") removing Suzanne as a beneficiary.  On October 1, 2015, David and Marylyn executed a second amendment to the Trust ("2015 Amendment").  The 2015 Amendment reinstated Suzanne as a beneficiary but limited her interest to the lesser of $1 million or one-

---

[1]  The record is voluminous and includes numerous depositions.  Although the Court has reviewed the entire record, only those details necessary to provide the relevant factual and procedural context are summarized below.

[2]  Article 15, Section A. 9 of the Trust provides:  "The trusts created under this Declaration of Trust have been accepted by the Trustee in the State of California, and unless provided in this instrument, their validity, construction, and all rights under them shall be governed by the laws of this State [California] in force from time to time."  (R. at 55.)

[3]  In the event that one or more of their three children predeceased David and/or Marylyn, the deceased child's share was to be distributed to that child's surviving descendants, in accordance with Article 10 of the Trust.  (R. at 41-42.)

third of the GST[4]-exempt property, with Kevin and Alex to share the remaining assets equally.[5]

In October 2016, David became gravely ill and was rushed to the hospital. At the time, David, Marylyn, Alex, and Kevin were residing in Kentucky, where the family had a horse farm. Suzanne and her husband, James, lived in California. Upon being informed of David's hospitalization and at Marylyn's request, Suzanne flew to Kentucky to join the rest of the family. After his release from the hospital, David requested a family meeting with his financial adviser, John Vilardo. The meeting took place over two days – October 27 and 28, 2016. In addition to Financial Adviser Vilardo, David, Marylyn, Suzanne, Alex, and Kevin were present on both days of the meeting.

According to Suzanne, on October 27, 2016, Alex and Kevin announced their intention to jointly own and operate Fallbrook Farm after their parents' deaths. Believing she still held an equal beneficiary interest, Suzanne stated that she would not interfere with their plan and agreed to negotiate terms for the sale of her interest in Fallbrook Farm. At some point that day, Suzanne was asked to retrieve the Trust documents from an office area. Upon reviewing them,

---

[4] Generation Skipping Tax Exemption. (R. at 32.)

[5] The trust's main assets were comprised of stock in a California construction company, Hazard Construction Company ("Hazard Construction"), and the family's Versailles, Kentucky horse farm, Fallbrook Farms.

she discovered that she was no longer designated as an equal beneficiary and that her share had been limited to a maximum of $1 million. Suzanne did not return to the meeting that day.

The meeting resumed the following day, October 28, 2016. Suzanne contends that it was during this meeting that David and Marylyn agreed to amend the Trust to equalize her share and Kevin and Alex acquiesced ("October 2016 Oral Agreement").[6] Financial Adviser Vilardo was tasked with working alongside the family's Kentucky attorney, William Hilliard, to prepare the necessary documents. However, no documents were executed prior to David's death on December 21, 2016.[7]

David's death triggered Articles 3, 4, 5, and 6 of the Trust. Under Article 3, David became the "Deceased Trustor" upon his death in December 2016. The Trust directed the Trustee to allocate David's share of the community property, along with any separate property, in accordance with specific provisions. These provisions required the division of the Trust into three sub-trusts: the Survivor's Trust, the Exempt Trust, and the Marital Trust. Pursuant to Article 12,

---

[6] Financial Advisor's Vilardo's characterization of the "agreement" was somewhat more nebulous. However, for the purposes of summary judgment, we accept Suzanne's account.

[7] According to Suzanne, Kevin concealed their father's deteriorating condition and failed to inform her of his death. She believes he did so intentionally to further alienate her from Marylyn. Suzanne did not learn of David's passing until December 28, 2016, when a nonfamily member informed her by text.

Marylyn had the "power to amend or revoke the Survivor's Trust, but no other trust under [the] Declaration of Trust [could] be amended or revoked" after the Deceased Trustor's death. (R. at 47.)[8] However, under Articles 5 and 6, Marylyn, as the Surviving Trustor, held a special power of appointment allowing her to determine how the assets of both the Marital and Exempt Trusts would be distributed upon her death.[9]

A little over a month after David's death, on January 30-31, 2017, Marylyn executed a series of documents that effectively disinherited Suzanne ("January 2017 Documents"). Suzanne alleges that these changes were the result of undue influence exerted by her brother Kevin and that Marylyn lacked testamentary capacity due to illness, alcohol use, cognitive decline, and/or depression. Marylyn died in August 2019.[10]

On December 30, 2019, Suzanne filed suit against the Appellees in Woodford Circuit Court. She sought enforcement of the alleged October 2016

---

[8] Pursuant to California Probate Code ("Cal. Prob. Code") § 16061.7, a trustee must serve notice when a revocable trust, or any portion thereof, becomes irrevocable due to the death of a settlor or a contingency related to a settlor's death that occurs within one year. It is undisputed that the Randals' California attorney, Jeremy Crickard, sent Suzanne the required notice on or about June 6, 2017.

[9] Marylyn was free to dispose of the Survivor's Trust in any manner she chose. However, her power of appointment over the Exempt and Marital Trusts was limited to directing distributions to one or more members of a class consisting of the Deceased Trustor's descendants.

[10] Alex predeceased Marylyn leaving behind two daughters, Bailey Foster and Meghan Randal, who are both named as appellees herein.

-6-

Oral Agreement or, in the alternative, a finding that the January 2017 Documents Marylyn executed removing her as a beneficiary are invalid due to Kevin's undue influence and/or Marylyn's lack of capacity.[11]  Over the course of the litigation, the trial court entered four key orders that Suzanne now challenges on appeal.

First, on September 2 and September 30, 2020, the trial court limited Suzanne's discovery of Marylyn's medical records to the period between January 1, 2016, and August 31, 2017, and her legal and financial records to the period between January 1, 2016, and March 1, 2017.  Suzanne contends the trial court erred in finding that discovery outside those timeframes would not lead to admissible evidence.  Next, she argues the trial court erred in its February 7, 2023, order excluding the testimony of her expert, Dr. Walter Butler.  Finally, Suzanne asserts that the trial court erred in granting summary judgment to Appellees on March 23, 2023.  She contends that the court should have granted summary judgment in her favor based on the alleged October 2016 Oral Agreement and, at a

---

[11]  Suzanne's complaint and subsequent amended complaints asserted several additional causes of action against Appellees.  However, she effectively abandoned those claims by failing to address them in her appellant's brief.  *Milby v. Mears*, 580 S.W.2d 724, 727 (Ky. App. 1979) ("An appellant's failure to discuss particular errors in his brief is the same as if no brief at all had been filed on those issues.").  Similarly, Suzanne does not reference the portion of the trial court's order granting summary judgment in favor of Meghan Randal.  It appears Meghan was named out of an abundance of caution, as she is a beneficiary of the Trust.  To the extent her inclusion was in that capacity, it was appropriate.  However, we agree with the trial court that Suzanne failed to present any evidence suggesting Meghan was personally involved in any of the alleged collusion, undue influence, or fraud underlying Suzanne's claims.

-7-

minimum, denied summary judgment on the claims of undue influence and lack of capacity, as genuine issues of material fact remain regarding the January 2017 Documents.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  CR[12] 56.03. The movant bears the initial burden of demonstrating that there is no genuine issue of material fact in dispute.

The party opposing the motion then has the burden to present, "at least some affirmative evidence showing that there is a genuine issue of material fact for trial."  *Steelvest, Inc. v. Scansteel Serv. Ctr, Inc.*, 807 S.W.2d 476, 482 (Ky. 1991); *Watson v. Landmark Urology, P.S.C.*, 642 S.W.3d 660, 666 (Ky. 2022).  "A party responding to a properly supported summary judgment motion cannot merely rest on the allegations in its pleadings."  *Versailles Farm Home and Garden, LLC v. Haynes*, 647 S.W.3d 205, 209 (Ky. 2022) (citing *Continental Cas. Co. v. Belknap Hardware & Mfg. Co.*, 281 S.W.2d 914, 916 (Ky. 1955)).  "[S]peculation

---

[12]  Kentucky Rules of Civil Procedure.

-8-

and supposition are insufficient to justify a submission of a case to the jury, and that the question should be taken from the jury when the evidence is so unsatisfactory as to require a resort to surmise and speculation." *O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006) (quoting *Chesapeake & Ohio Ry. Co. v. Yates*, 239 S.W.2d 953, 955 (Ky. 1951)).

"An appellate court's role in reviewing a summary judgment is to determine whether the trial court erred in finding no genuine issue of material fact exist[ed] and the moving party was entitled to judgment as a matter of law." *Feltner v. PJ Operations, LLC*, 568 S.W.3d 1, 3 (Ky. App. 2018). The standard of review for an appellate court is *de novo* because only legal issues are involved. *Isaacs v. Sentinel Ins. Co. LTD.*, 607 S.W.3d 678, 681 (Ky. 2020).

## B. Discovery and Evidentiary Related Matters

"Our standard of review in matters involving a trial court's rulings on evidentiary issues and discovery disputes is abuse of discretion." *Manus, Inc. v. Terry Maxedon Hauling, Inc.*, 191 S.W.3d 4, 8 (Ky. App. 2006) (citations omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

## III. ANALYSIS

### A. The October 2016 Oral Agreement

The trial court first determined that all of Suzanne's claims, including her claim to enforce the alleged October 2016 Oral Agreement, were barred under Cal. Prob. Code § 16061.8, which provides:

> A person upon whom the notification by the trustee is served pursuant to paragraph (1) of subdivision (a) of Section 16061.7, whether the notice is served on the person within or after the time period set forth in subdivision (f) of Section 16061.7, **shall not bring an action to contest the trust** more than 120 days from the date the notification by the trustee is served upon the person, or 60 days from the date on which a copy of the terms of the trust is delivered pursuant to Section 1215 to the person during that 120-day period, whichever is later.

Cal. Prob. Code § 16061.8 (emphasis added). It is undisputed that Suzanne received the required notification in June 2017, and that she did not file the instant suit until December 30, 2019.

We agree with Suzanne that Cal. Prob. Code § 16061.8 is not applicable to bar _all_ her claims. The statute plainly applies only to actions contesting the validity of a trust. "Actions that _challenge the validity of a trust_ are actions that 'contest the trust' under section 16061.8." _Hamilton v. Green_, 316 Cal. Rptr. 3d 632, 636 (Cal. App. 2d 2023) (emphasis added). "In determining whether that constitutes an action to contest the trust within the purview of section 16061.8, we look to the substance of that petition and its 'practical effect.' We are

-10-

not bound by its label." *Estate of Stoker*, 122 Cal. Rptr. 3d 529, 533 (Cal. App. 2d 2011). "The fact a legal proceeding results in changing the distribution under a will is not in itself determinative of whether a prohibited contest has occurred." *Estate of Watson*, 223 Cal. Rptr. 14, 16 (Cal. App. 4th 1986).

Contracts to make an instrument are distinct from the instrument itself. *Id.* The imposition of a constructive trust on property which the promisor left to others in violation of the contract is the appropriate remedy to compel performance of an oral agreement. *In re Marriage of Edwards*, 45 Cal. Rptr. 2d 138, 141 (Cal. App. 2d 1995). In this sense, Suzanne is not contesting the validity of the Trust, she is seeking to enforce an independent contractual right. *Estate of Watson*, 223 Cal. Rptr. at 17 ("Here, the daughters do not seek a distribution based on the terms of the will itself or to establish the will is any way invalid, e.g., due to fraud or undue influence . . . but rather seek enforcement of a separate and distinct oral agreement.").

Suzanne's claim seeking to enforce the alleged October 2016 Oral Agreement is not inherently inconsistent with the existence and validity of the Trust itself. The alleged October 2016 Oral Agreement can be enforced without striking down the Trust entirely, or even partially. Moreover, the remedy Suzanne seeks, a constructive trust over the Trust's assets, is not incompatible with the Trust itself. Accordingly, we hold that Suzanne's claim seeking to enforce the

-11-

alleged October 2016 Oral Agreement is not in substance "an action to contest" the Trust, and therefore, her claim based on the alleged oral agreement is not barred by Cal. Prob. Code § 16061.8. *See Packard v. Packard*, 330 Cal. Rptr. 3d 203, 208 (Cal. App. 4th 2025) (holding that action seeking to reform a trust to conform to the trustor's allege intent for his assets to be divided equally between his two children did not constitute a trust contest).

Under California law,[13] an oral agreement to modify a trust is enforceable under some circumstances as outlined in Cal. Prob. Code § 21700(a). The relevant portion of this statute provides:

> A contract to make a will or devise or ***other instrument*** . . . if made after the effective date of this statute [January 1, 2001], can be established only by one of the following: . . . (4) [c]lear and convincing evidence of an agreement between the decedent and the claimant or a promise by the decedent to the claimant that is enforceable in equity

---

[13] Confusingly, although the trial court applied California law when determining the statute of limitations, when it addressed the substance of Suzanne's breach of the oral agreement claim, it concluded that Kentucky law should apply because the parties were located in Kentucky when the alleged agreement was made. While this is true, the alleged agreement pertained to a California Trust, a trust which contains a California choice of law provision. Additionally, the Trust's largest asset, the Hazard Construction stock was located in California, and despite having moved to Kentucky, the Randals continued to work with California Attorney Crickard when matters concerning the Trust were at issue. "[I]n multi-state matters, Kentucky traditionally follows the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1988)." *Major v. Commonwealth*, 275 S.W.3d 706, 714 (Ky. 2009). Kentucky courts recognize choice of law provisions and "the parties' choice of law should be honored unless (1) 'the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice,' or (2) 'application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest.'" *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 398 (6th Cir. 2000) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971)). Given the facts of this case, we cannot conclude that Kentucky has a "materially greater interest" in the outcome of this matter than California.

-12-

[or] (5) [c]lear and convincing evidence of an agreement between the decedent and another person for the benefit of the claimant or a promise by the decedent to another person for the benefit of the claimant that is enforceable in equity."

*Id.* (emphasis added). "'Instrument' means a will, a document establishing or modifying a trust, a deed, or any other writing that designates a beneficiary or makes a donative transfer of property." Cal. Prob. Code § 45.

"If a person has a claim that arises from a promise or agreement with a decedent to distribution from an estate or trust or under another instrument, whether the promise or agreement was made orally or in writing, an action to enforce the claim to distribution may be commenced *within one year after the date of death*, and the limitations period that would have been applicable does not apply." Cal. Civ. Proc. Code § 366.3 (emphasis added). "[T]he plain reading of section 366.3 applies to a claim based on a promise or agreement made by a decedent to create an instrument that would effectuate a distribution to the claimant[.]" *Smith v. Myers*, 323 Cal. Rptr. 3d 157, 164 (Cal. App. 3d 2024).

Below, Suzanne argued that the statute should not have begun to run on her claim with respect to the 2016 Oral Agreement until after Marylyn's death. However, this argument runs counter to the evidence as presented by Suzanne. Suzanne asserted that David *and* Marylyn agreed to amend the Trust. The Trust itself could only be amended by the signatures of both trustors. After David's

-13-

death, the nature of the Trust changed. While the Surviving Trustor retained the right to direct distribution of the Marital and Exempt Trust to one or more members of a class consisting of the Deceased Trustor's descendants, the Trust itself could no longer be amended or revoked.

Suzanne asserts that David and Marylyn agreed to *amend* the Trust to make Suzanne an equal beneficiary. Pursuant to the terms of the Trust such an amendment required David and Marylyn to jointly agree to do so in writing. It became impossible for them to fulfill this agreement upon the death of either. The agreement was breached when David died, and pursuant to Cal. Civ. Proc. Code § 366.3, Suzanne had one year from David's death to make a claim based on the October 2016 Oral Agreement. David died on December 21, 2016. Suzanne, however, did not file her suit until December 30, 2019, some two years after the statute of limitations expired for her to sue based on the 2016 Oral Agreement. Thus, although our reasoning differs somewhat, we ultimately agree with the trial court that Appellees were entitled to summary judgment with respect to Suzanne's claim for enforcement of the 2016 Oral Agreement.

Additionally, even if the statute of limitations on the alleged 2016 Oral Agreement had not expired, such an agreement did not necessarily preclude Marylyn's subsequent actions regarding distribution of the subtrusts. In *Betchart*

-14-

*v. Betchart*, No. A167024, 2024 WL 4633411 (Cal. App. 2d Oct. 31, 2024),[14] the plaintiff, Tony, claimed his mother, Wally, orally agreed in July 2005 to leave him certain real property if he continued operating the family business. However, Wally executed multiple subsequent written amendments to her trust – some including Tony as beneficiary, others not. Even if there had been a valid oral agreement, the court pointed out that the trustor's later amendments – all of which were written and executed – demonstrated her intent to retain control over the property and modify distributions as she saw fit. *Id.* at *2-3 ("Tony's testimony . . . did not support his allegation that [Wally] agreed to make an *irrevocable* bequest to him of anything.") (emphasis added).

Much like the plaintiff in *Betchart*, Suzanne failed to produce evidence that the parties intended any oral agreement to be irrevocable. At best, Suzanne adduced evidence showing that the parties reached a tentative understanding in October 2016 for Suzanne to be equalized in some fashion. The exact terms were not agreed upon during the family's meetings, and even viewing the evidence in Suzanne's favor, the agreement, at best, was one to agree on final terms after they had been reduced to writing. This is insufficient. "[N]either law nor equity provides a remedy for breach of an agreement to agree in the future."

---

[14] We do not cite this unpublished opinion as binding precedent, but only as illustrative of the relevant points of law, pursuant to Kentucky Rule of Appellate Procedure (RAP) 41.

-15-

*Autry v. Republic Productions*, 30 Cal. 2d 144, 151 (Cal. 1947). This includes

"[p]reliminary negotiations or agreements for future negotiations[.]" *City of*

*Oakland v. Department of Finance*, 294 Cal. Rptr. 3d 405, 417 (Cal. App. 3d

2022).

### B. Lack of Capacity/Undue Influence

It is unclear if the trial court concluded that Suzanne's alternative

claim, that the documents Marylyn executed in January 2017 are invalid due to

lack of testamentary capacity and/or undue influence, was also time barred by Cal.

Prob. Code § 16061.8. To the extent it did so, this was in error. The June 2017

notice that triggered Cal. Prob. Code § 16061.8 was occasioned by David's death

and related to the irrevocable provisions of the Trust. Certainly, any action

challenging those provisions had to be commenced within the statutory time

period.[15]

However, Suzanne's claims regarding the validity of the January 2017

Documents Marylyn executed do not relate to the portions of the Trust Suzanne

was notified about in June 2017. During Marylyn's lifetime, the 2017 documents

could be amended at any time. Suzanne's claim regarding the validity of the

---

[15] Suzanne alleged that both David and Marylyn agreed to modify the Trust to make her an equal beneficiary. As noted above, modification of the main Trust required the signatures of both Trustors. When David died, certain portions of the Trust became irrevocable. At that point, it was no longer possible to amend the main Trust.

-16-

January 2017 Documents did not even accrue until Marylyn died in August 2019.[16]

Suzanne filed her complaint in December 2019, just a few months after Marylyn died. To the extent that the action sought to invalidate the 2017 documents executed by Marylyn, it was timely.

This brings us to Suzanne's argument that genuine issues of material fact exist regarding her claims of lack of capacity and undue influence, thereby requiring a jury trial under CR 56.03 as to the validity of the documents Marylyn executed in January 2017. To determine whether Suzanne's proof was sufficient to overcome summary judgment, we must first examine the elements necessary to establish those claims. Next, we consider whether the trial court properly excluded the opinions of Suzanne's expert witness, Dr. Butler. Only then can we assess whether her evidence created a genuine issue of material fact and demonstrated a reasonable likelihood of success at trial.

We find much guidance in *Bye v. Mattingly*, 975 S.W.2d 451 (Ky. 1998), the seminal Kentucky case on incapacity and undue influence.[17] Summarizing testamentary capacity, the *Bye* court stated:

---

[16] Quite simply, pre-mortem actions seeking to set aside a will or revocable trust are not justiciable. *Linthicum v. Rudi*, 148 P.3d 746, 747 (Nev. 2006) (holding disinherited beneficiaries of a revocable trust lacked standing to challenge trust amendments executed by a living settlor); *Matter of Guardianship of Radda*, 955 N.W.2d 203, 211 (Iowa 2021) (collecting cases).

[17] Although the Trust includes a California choice-of-law provision, both Suzanne and Appellees appear to agree that Kentucky law governs the claims of lack of capacity and undue

-17-

In Kentucky there is a strong presumption in favor of a testator possessing adequate testamentary capacity. This presumption can only be rebutted by the strongest showing of incapacity. *Williams v. Vollman*, Ky.App., 738 S.W.2d 849 (1987); *Taylor v. Kennedy*, Ky.App., 700 S.W.2d 415, 416 (1985). Testamentary capacity is only relevant at the time of execution of a will. *New v. Creamer*, Ky., 275 S.W.2d 918 (1955). . . .

"Kentucky is committed to the doctrine of testatorial absolutism." J. Merritt, 1 Ky.Prac. – Probate Practice & Procedure, § 367 (Merritt 2d ed. West 1984). *See New v. Creamer*, Ky., 275 S.W.2d 918 (1955); *Jackson's Ex'r v. Semones*, 266 Ky. 352, 98 S.W.2d 505 (1937). The practical effect of this doctrine is that the privilege of the citizens of the Commonwealth to draft wills to dispose of their property is zealously guarded by the courts and will not be disturbed based on remote or speculative evidence. *American National Bank & Trust Co. v. Penner*, Ky., 444 S.W.2d 751 (1969). The degree of mental capacity required to make a will is minimal. *Nance v. Veazey*, Ky., 312 S.W.2d 350, 354 (1958). The minimum level of mental capacity required to make a will is less than that necessary to make a deed, *Creason v. Creason*, Ky., 392 S.W.2d 69 (1965), or a contract. *Warnick v. Childers*, Ky., 282 S.W.2d 608 (1955).

To validly execute a will, a testator must: (1) know the natural objects of her bounty; (2) know her obligations to them; (3) know the character and value of her estate; and (4) dispose of her estate according to her own fixed purpose. *Adams v. Calia*, Ky., 433 S.W.2d 661 (1968); *Waggener v. General Ass'n of Baptists*, Ky., 306 S.W.2d 271 (1957); *Burke v. Burke*, Ky. App., 801 S.W.2d 691 (1990); *Fischer v. Heckerman*, Ky. App., 772 S.W.2d 642 (1989). Merely being an older person, possessing a failing memory, momentary forgetfulness, weakness of

_____

influence, as both parties cite only Kentucky law in these sections of their briefs. Accordingly, we assume, without deciding, that Kentucky law applies to these claims.

mental powers or lack of strict coherence in conversation does not render one incapable of validly executing a will. *Ward v. Norton*, Ky., 385 S.W.2d 193 (1964). Every man possessing the requisite mental powers may dispose of his property by will in any way he may desire, and a jury will not be permitted to overthrow it, and to make a will for him to accord with their ideas of justice and propriety." *Burke v. Burke*, Ky. App., 801 S.W.2d 691, 693 (1991) (citing *Cecil's Ex'rs. v. Anhier*, 176 Ky. 198, 195 S.W. 837, 846 (1917)).

. . .

While a ruling of total or partial disability certainly is evidence of a lack of testamentary capacity, it is certainly not dispositive of the issue. This Court has upheld the rights of those afflicted with a variety of illnesses to execute valid wills. *Tate v. Tate's Ex'r*, Ky., 275 S.W.2d 597 (1955) (testator suffered deafness and retarded speech); *Bush v. Lisle*, 89 Ky. 393, 12 S.W. 762 (1889) (testator was blind); *In re: McDaniel's Will*, 25 Ky. 331 (1829) (testator was paralyzed); *Bodine v. Bodine*, 241 Ky. 706, 44 S.W.2d 840 (1932) (testator was an epileptic). We have not disturbed the testatorial privileges of those who believed in witchcraft, spiritualism or atheism. While none of these cases absolutely parallels the instant case, we recite them here to demonstrate how this Court has always taken the broadest possible view of who may execute a will no matter what their infirmity.

When a testator is suffering from a mental illness which ebbs and flows in terms of its effect on the testator's mental competence, it is presumed that the testator was mentally fit when the will was executed. This is commonly referred to as the lucid interval doctrine. *Warnick v. Childers*, Ky., 282 S.W.2d 608, 609 (1955); *Pfuelb v. Pfuelb*, 275 Ky. 588, 122 S.W.2d 128 (1938). *See In re Weir's Will*, 39 Ky. 434 (1840); *Watts v. Bullock*, 11 Ky. 252 (1822). . . . By employing this

doctrine, citizens of the Commonwealth who suffer from a debilitating mental condition are still able to dispose of their property.

The lucid interval doctrine is only implicated when there is evidence that a testator is suffering from a mental illness; otherwise the normal presumption in favor of testamentary capacity is operating. The burden is placed upon those who seek to overturn the will to demonstrate the lack of capacity. *Warnick*, 282 S.W.2d at 609; *Pfuelb*, 275 Ky. at 588, 122 S.W.2d at 128. The presumption created is a rebuttable one, so that evidence which demonstrates conclusively that the testator lacked testamentary capacity at the time of the execution of the will results in nullifying that will.

*Id.* at 455-56.

Regarding undue influence, the *Bye* court explained,

Undue influence is a level of persuasion which destroys the testator's free will and replaces it with the desires of the influencer. *Nunn v. Williams*, Ky., 254 S.W.2d 698, 700 (1953); *Williams v. Vollman*, Ky. App., 738 S.W.2d 849, 850 (1987). In discerning whether influence on a given testator is "undue," courts must examine both the nature and the extent of the influence. First, the influence must be of a type which is inappropriate. Influence from acts of kindness, appeals to feeling, or arguments addressed to the understanding of the testator are permissible. *Nunn*, 254 S.W.2d at 700; *Fischer v. Heckerman*, Ky. App., 772 S.W.2d 642, 645 (1989). Influence from threats, coercion and the like are improper and not permitted by the law. *Lucas v. Cannon*, 76 Ky. 650 (1878). Second, the influence must be of a level that vitiates the testator's own free will so that the testator is disposing of her property in a manner that she would otherwise refuse to do. *See v. See*, Ky., 293 S.W.2d 225 (1956); *Rough v. Johnson*, Ky., 274 S.W.2d 376 (1955). The essence of this inquiry is whether the testator is

exercising her own judgment. *Mayhew v. Mayhew*, Ky.,
329 S.W.2d 72 (1959); *Copley v. Craft*, Ky., 312 S.W.2d
899 (1958).

In addition to demonstrating that undue influence was
exercised upon the testator, a contestant must also show
influence prior to or during the execution of the will.
Undue influence exercised after the execution of the will
has no bearing whatsoever upon whether the testator
disposed of her property according to her own wishes.
*Bennett v. Bennett*, Ky., 455 S.W.2d 580 (1970); *Wallace
v. Scott*, Ky. App., 844 S.W.2d 439 (1992); *Fischer v.
Heckerman*, Ky. App., 772 S.W.2d 642 (1989). The
influence must operate upon the testator at the execution
of the will. If the influence did not affect the testator,
then such conduct is irrelevant. *Bodine v. Bodine*, 241
Ky. 706, 44 S.W.2d 840 (1932); *Walls v. Walls*, 30 Ky.
Law Rep. 948, 99 S.W. 969 (1907). However, even if
the influence occurred many years prior to the execution
of the will, but operates upon the testator at the time of
execution, it is improper and will render the will null and
void. *Id.*

To determine whether a will reflects the wishes of the
testator, the court must examine the indicia or badges of
undue influence. Such badges include a physically weak
and mentally impaired testator, a will which is unnatural
in its provisions, a recently developed and comparatively
short period of close relationship between the testator and
principal beneficiary, participation by the principal
beneficiary in the preparation of the will, possession of
the will by the principal beneficiary after it was reduced
to writing, efforts by the principal beneficiary to restrict
contacts between the testator and the natural objects of
his bounty, and absolute control of testator's business
affairs. *Belcher v. Somerville*, Ky., 413 S.W.2d 620
(1967); *Golladay v. Golladay*, Ky., 287 S.W.2d 904, 906
(1955).

. . .

-21-

When a contestant seeks to claim that undue influence was employed upon a testator, the burden is upon the contestant to demonstrate the existence and effect of the influence. *Nunn v. Williams*, Ky., 254 S.W.2d 698, 700 (1953). Merely demonstrating that the opportunity to exert such influence is not sufficient to sustain the burden of proof. *Id.* When undue influence and a mentally impaired testator are both alleged and the mental impairment of the testator is proven, the level of undue influence which must be shown is less than would normally be required since the testator is in a weakened state. *Creason v. Creason*, Ky., 392 S.W.2d 69 (1965); *Sloan v. Sloan*, 303 Ky. 180, 197 S.W.2d 77, 80 (1946).

In Kentucky no presumption of undue influence arises from a bequest by a testator who has a confidential relationship with the beneficiary. *Palmer v. Richardson*, 311 Ky. 190, 197, 223 S.W.2d 745, 749-50 (1949); *McAtee v. McAtee*, 297 Ky. 865, 874, 181 S.W.2d 401, 405 (1944); *Kiefer's Ex'r v. Deibel*, 292 Ky. 318, 166 S.W.2d 430, 433-34 (1942); 1 Ky. Prac. – Probate Practice & Procedure, § 555 (Merritt 2d ed.1984). There is no question when a testator who has a confidential relationship with one who receives a benefit under a will, such a transaction should certainly be examined and placed into evidence before the jury, but no presumption of wrongdoing is created. In fact, it is not uncommon or inappropriate for a testator to make such a bequest to one who has provided comfort and support to the testator. *Ecken's Ex'x v. Abbey*, 283 Ky. 449, 141 S.W.2d 863 (1940); *Karr v. Karr's Ex'r*, 283 Ky. 355, 141 S.W.2d 279 (1940).

*Id.* at 456-58.

With these overarching principles in mind, we turn to the trial court's order sustaining Appellees' motion to exclude Dr. Butler's testimony based on its

conclusion that "his opinions were speculative, likely to mislead a jury, and would not assist the trier of fact in determining Marylyn's testamentary capacity when she signed the Trust documents on or about January 30 and 31, 2017."

Dr. Butler was retained by Suzanne to provide an opinion on Marylyn's capacity to execute the January 2017 Documents. Dr. Butler obtained a juris doctorate from Vanderbilt University School of Law in 1973 and a medical doctorate from the University of Louisville School of Medicine in 1990. He completed a residency program in psychiatry in 1994 and is board certified in general psychiatry. Dr. Butler reviewed approximately 4,400 pages of Marylyn's medical records as well as the deposition testimony of various witnesses who interacted with Marylyn at and around the time she executed the January 2017 Documents.[18]

> According to Dr. Butler,
>
> The Baptist Hospital medical records show that [Marylyn] was hospitalized four times between January 1, 2017 and June 2017, and alcohol cirrhosis and alcohol abuse were noted as diagnoses for all hospitalizations during that time period. [Marylyn] had one serious admission to the hospital on January 5, 2017, three weeks before the January 30, and 31, 2017 Trust documents were signed, and another serious hospitalization on February 2, 2017, just two days after the January 2017 Trust documents were signed.

---

[18] While Dr. Butler reviewed the deposition testimony of the various witnesses, his opinions were based almost exclusively on his review of Marylyn's medical records.

The January 5, 2017, and February 2, 2017, medical events demonstrate that there were significant impairments in [Marylyn's] mental capacity when the documents were signed on January 30 and 31, 2017. The clinical records show [Marylyn] to be encephalopathic, that is showing diffuse cerebral dysfunction ("confusion"), due at least in part to metabolic derangements in the setting of chronic alcohol dependence and acute intoxication coupled with many severe and chronic medical conditions.

. . .

In the timeframe surrounding [Marylyn's] execution of legal and testamentary documents at the end of January 2017, the debilitating cognitive effects of her chronic alcoholism with a multitude of medical problems including poorly controlled blood glucose levels made it impossible for [Marylyn] to knowingly engage in the supervision of preparation and execution of those documents. She had been admitted to the hospital about three weeks prior to execution of her will and other testamentary documents and was then readmitted to the hospital just 2 days after she executed her testamentary documents. In early February 2017, [Marylyn] was readmitted for septic shock related to a urinary tract infection, acute renal failure with function impairments in ambulation, gait and balance.

Testamentary capacity in this context means a testator's cognitive capacity to understand the nature and extent of their property, their relationship to those who may naturally claim to benefit from the property they leave, and the practical effect of the provision of the will being signed.

[Marylyn's] testamentary capacity was markedly impaired at the time of the signing of the testamentary documents in late January 2017. [Marylyn] in late January 2017 did not have the testamentary capacity due

to the impairing effects of chronic alcoholism and medical illnesses including sepsis and poorly controlled diabetes to knowingly participate in preparation, direction, and review of testamentary documents being prepared on her behalf. She did not have a full awareness of her assets and property, making provisions for the "natural objects of her bounty" taking into account previous promises to her children, and the manner in which a distribution is being made of her assets and property.

In addition to having the effects of chronic alcoholism and mental complications including sepsis and wide variances of her blood glucose levels, [Marylyn] was noted to be depressed. The medical record notes that during the early January 2017 hospitalization, [Marylyn] was depressed over the recent death of her husband and she was noted to be experiencing affective reactions of grief related to [her] husband's recent passing with appetite loss, physical symptoms (headaches, nausea, tiredness) and social isolation. Depression due to grief and loss can have its own emotional burden and impairing cognitive consequences.

In summary, it is my opinion within a reasonable degree of medical probability that based on the medical records and other evidence currently available, that [Marylyn] lacked testamentary capacity and was most certainly susceptible to undue influence in connection with the preparation of the testamentary documents in late January 2017.

My opinions are based on the clinical and other materials provided but I reserve the right to modify or amend my opinion with additional information.

(R. 774-82).  Dr. Butler was deposed on August 11, 2022.[19]  While Dr. Butler admitted during his deposition that he could not give a start or end start for Marylyn's limited testamentary capacity, he testified that that "the most important thing [about the medical records is] that they show a period of continued deterioration . . . certainly between the 5th of January and the 2nd of February in 2017." (R. 893.)  While Dr. Butler used the term "speculation" during his testimony, he clarified that his opinion was a reasonable one based on the medical records he reviewed.  (R. 895.)

"The trial court acts as a gatekeeper regarding scientific testimony, only admitting evidence that is scientifically reliable and relevant to the case before it." *Jackson v. Ghayoumi*, 419 S.W.3d 40, 43 (Ky. App. 2012).  Kentucky's requirements for the admissibility of expert witness testimony are contained in KRE[20] 702.  It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the proponent demonstrates to the court that it is more likely than not that:

---

[19]  Frustratingly, despite the fact that the parties filed complete deposition transcripts for most of the witnesses, Dr. Butler's complete deposition transcript was never made part of the record below.  Only excerpted portions of Dr. Butler's deposition transcript were attached to the parties' filings regarding the qualification of Dr. Butler as an expert witness.

[20]  Kentucky Rules of Evidence.

-26-

(1) The testimony is based upon sufficient facts or data;

(2) The testimony is the product of reliable principles and methods; and

(3) The witness' opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.* Essentially, the determination of whether an expert satisfies KRE 702 is about relevance and reliability. *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 578 (Ky. 2000).

The standard by which a trial court should assess the reliability of expert testimony was set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Under the *Daubert* standard, the trial court must make a preliminary determination "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.*, 509 U.S. at 592, 113 S. Ct. at 2796.

"Our decisions teach that opinion testimony as to the mental capacity of a testator is admissible, whether the evidence is presented through medical experts or laymen[.]" *Tr. Dep't of First Nat. Bank v. Heflin*, 426 S.W.2d 128, 131 (Ky. 1968). The question before us is whether such testimony must be confined to the date the contested documents were executed.

A similar issue was addressed in *Pardue v. Pardue*, 227 S.W.2d 403 (Ky. 1950), where the decedent executed a will in August 1943, leaving the bulk of his estate to one of his eight children. The Court considered whether the testimony of the decedent's physician was admissible, despite the physician not having seen the decedent during the month the will was executed. The Court determined that the testimony was properly admitted noting:

> evidence of the testator's mental status both before and after the execution of the will are admissible so long as they have a reasonable tendency to indicate his mental condition at the time of the execution of the will. In fact, in determining whether the mind of the testator was sound at the time his will was executed it is important to know the condition of his mind a reasonable length of time before and after the execution[.]

*Id.* at 405 (internal quotation marks and citations omitted). *See also Cubbage v. Gray*, 411 S.W.2d 28, 29 (Ky. 1967) (finding testimony from a doctor who had attended the decedent in the month before and after execution of a will was relevant on the issue of capacity).

In *Osborn v. Paul*, 114 S.W.2d 1134, 1138 (Ky. 1938), a disinherited daughter argued that her father's will was invalid due to lack of capacity and undue influence. At trial, the daughter presented evidence that the testator's ten years of constant alcoholism had destroyed his mental ability to execute a will. In affirming the jury's verdict in favor of the daughter the *Osborn* court explained that testimony related to the effect of the father's alcoholism was relevant because

it explained how the father might have appeared to the casual observer to be normal at any moment in time even though his mind and body were "permanently distorted [by his alcoholism] so as that he view[ed] the realities of life through mentally smoked glasses." *Id.* at 1137.

Similarly, in *Duval v. Duval*, 60 S.W.2d 351 (Ky. 1933), the Court upheld a jury verdict finding a will invalid for lack of capacity and undue influence. The evidence included medical testimony regarding how the decedent's longstanding alcoholism and bladder problems affected his mental faculties and made him more susceptible to the influence of others. Notably, in affirming the jury's verdict, the *Duval* court found the testimony of the appellee's medical expert to be substantial, even though the expert was "unable to state positively" that the decedent lacked the mental capacity to execute his will in 1925, as he had not personally treated the decedent at that time. *Id.* at 353.

Most recently, in *Getty v. Getty*, 581 S.W.3d 548 (Ky. 2019), the Kentucky Supreme Court upheld a jury verdict invalidating certain estate documents executed by Dick Getty in 2008, which left the bulk of his estate to his current wife, Sue, excluding his two adult children from a prior marriage, Rich and Yolanda. After Dick's death, Rich and Yolanda's daughter, Sesamie, filed suit against Sue, seeking to invalidate the 2008 estate plan. A jury found the 2008 plan invalid, thereby reinstating the provisions of Dick's 2004 estate plan. On appeal,

this Court reversed, holding that the trial court should have directed a verdict in Sue's favor on the claims of lack of testamentary capacity and undue influence. In doing so, this Court noted that admission of medical testimony postulating that Dick's medical condition and medication "*could* have had the effect of mentally incapacitating him" when he executed the 2008 estate plan merely provided "grounds for improper speculation and conjecture" by the jury. *Getty v. Getty*, No. 2014-CA-000686-MR, 2017 WL 4712637, at \*14 (Ky. App. Oct. 6, 2017), *not to be published*, *aff'd in part, rev'd in part and remanded*, 581 S.W.3d 548 (Ky. 2019).

The Kentucky Supreme Court accepted discretionary review and, after an extensive review of the record, concluded that the evidence was sufficient to support the jury's verdict. That evidence included the testimony of Dr. Stephen Raffle, an expert witness called by Rich and Sesamie. Like Dr. Butler in this case, Dr. Raffle had not personally examined the decedent. Instead, his opinion was based on a review of medical records. Relying on those records, Dr. Raffle testified that, in his medical opinion as a forensic psychiatrist, Dick Getty was "physically weak and mentally impaired" at the time he executed the 2008 estate plan. In part, Sue attacked the relevance and legitimacy of Dr. Raffle's testimony because he had not treated Dick and could not definitively say whether he was lucid on the day he executed the 2008 estate plan documents. In rejecting this

-30-

argument, the Kentucky Supreme Court noted that the "medical evidence presented by Rich and Sesamie suggests that Dick could have been a 'mentally impaired testator'" when he executed the 2008 estate plan documents and that such evidence was relevant on the issue of capacity and susceptibility to undue influence. *Getty*, 581 S.W.3d at 558.

Relying on *Stuckey v. Young*, No. 2013-CA-001029-MR, 2015 WL 394104 (Ky. App. Jan. 30, 2015), an unpublished summary judgment opinion from this Court, the trial court concluded that "because Dr. Butler cannot offer any opinion as to [Marylyn's] testamentary capacity on January 30-31, 2017, his opinion must be excluded as speculative."[21] Based on this conclusion, the trial court determined that "Dr. Butler's expert opinion fails the second prong of the *Daubert* analysis."

In *Stuckey*, as here, the physician reviewed only the decedent's medical records and opined that the decedent "was not competent to execute a valid will because she was suffering from moderate to severe cognitive deficits as a result of dementia due to Alzheimer's disease." *Id.* at *3. In affirming summary judgment, we rejected the appellant's argument that "Dr. Gripshover's opinion is

---

[21] Pursuant to RAP 41(A): "'Not To Be Published' opinions of the Supreme Court and the Court of Appeals are not binding precedent and citation of these opinions is disfavored." *See Johnson v. Commonwealth*, 659 S.W.3d 832, 837 (Ky. App. 2021) (citation omitted) ("[U]npublished opinions are not binding precedent, but only persuasive authority. Therefore, we are not required to follow their holdings.").

entitled to a *higher* degree of deference because he is an expert." *Id.* (emphasis added). We ultimately held that "[e]vidence that [the decedent] suffered mental and physical infirmities in the days and weeks surrounding the execution of the will was insufficient in the absence of any proof that she was incompetent on the day and moment she signed the will." *Id.* This, however, is a far cry from holding that the medical opinion itself should have been excluded.

A careful review of Kentucky case law convinces us that medical testimony regarding a decedent's condition – both before and after the execution of contested documents – is highly relevant in cases involving claims of lack of capacity or undue influence. This is not to say that such evidence is conclusive or sufficient to support a verdict on its own. Rather, it is one piece of the broader evidentiary puzzle that a plaintiff must assemble for the jury. It is true that Dr. Butler could not offer testimony about Marylyn's precise condition on the specific days she executed the documents. But neither could the medical experts in *Pardue, Cubbage*, *Osburn*, *Duval*, or *Getty*. Nevertheless, in each of those cases, Kentucky appellate courts recognized the medical testimony as a relevant and important factor for the jury's consideration in assessing the decedent's mental capacity and the presence or absence of undue influence.[22]

---

[22] "'Belief' is not evidence and does not create an issue of material fact." *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990); *see also Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. App. 2007) ("A party's subjective beliefs about the nature of the evidence is not the

"Proposed expert testimony does not have to take into account every possible factor or variable in a unique, complex system, *e.g.*, the human body, in order to be relevant. Such an undertaking would likely be impossible by any expert witness." *Miller v. Eldridge*, 146 S.W.3d 909, 921 (Ky. 2004). "[Dr. Butler's] failure to account for all of the complexities of the human body or the specifics of [Marylyn's] condition would be comparable to a failure by an expert to account for bad weather or a witness's poor eyesight when giving testimony as to the effect of phases of the moon on the amount of natural light, and thus on visibility, on a given night. In both cases, the failure to take into account those further variables goes more to the weight of the testimony than its admissibility." *Id.* at 921.

Dr. Butler is a qualified medical expert whose opinion was based on an extensive review of Marylyn's medical records. While he did not personally examine Marylyn or opine on her exact mental state at the moment she signed the January 2017 Documents, Kentucky law does not impose such a requirement for admissibility. As the Kentucky Supreme Court made clear in *Getty*, expert

---

sort of affirmative proof required to avoid summary judgment."). Thus, conclusory allegations based upon conjecture and speculation are insufficient to swing the pendulum from possibility to probability. However, the fact that an inference must be drawn from the evidence presented does not render the proof speculative. "[E]ssential facts may be proved by circumstantial evidence in which event it is not necessary that proof rise to a degree of certainty which will exclude every other reasonable conclusion[.]" *Coleman v. Baker*, 382 S.W.2d 843, 848 (Ky. 1964). "Reasonable probability is all that is required of evidence in order to support a factual conclusion." *Id.* at 847.

opinions based on medical record review – particularly when addressing a testator's overall cognitive trajectory – are admissible and relevant to the jury's determination of testamentary capacity and susceptibility to undue influence.

"The *Daubert* test is designed to keep out unreliable or 'pseudoscientific' expert scientific testimony that would confuse or mislead the jury, or that cannot legitimately be challenged in a courtroom." *Commonwealth v. Martin*, 290 S.W.3d 59, 67 (Ky. App. 2008). "[E]ven accepting the trial court's assessment of its flaws, Dr. Butler's opinions could not be described as 'pseudoscientific' or 'junk science.'" *Id.* Dr. Butler's opinion was not "speculative" in the same sense of the word that would trigger prohibition under *Daubert*. It was grounded in sound medical principles, applied to detailed clinical data, and offered within the framework Kentucky courts have long recognized as proper in will/trust-contest cases. His inability to pinpoint the precise moment Marylyn lacked capacity goes to the weight of his testimony, not its admissibility. The trial court's decision to exclude this critical piece of expert evidence was an abuse of its discretion and clear error.

The trial court did not review Suzanne's lack of capacity and undue influence claims in any great detail, possibly because it had already determined that the claims were time barred. However, on the final two pages of its March 2023 order granting summary judgment to Appellees, the trial court noted that

Suzanne could not prevail on her lack of capacity claims due to her failure to produce any evidence to counter Appellees' witnesses who testified that Marylyn was lucid when she executed the January 2017 Documents.

Certainly, there is an abundance of evidence in the record that Marylyn was cognizant of her actions when she signed the January 2017 Documents and that they reflected her desires. Attorney Crickard testified that he communicated with Marylyn following David's death and that during those communications Marylyn indicated that she was angry with Suzanne's behavior and wanted to disinherit her. Additionally, Peggy Cains-Gilletee and Deborah Winbun, the two witnesses to the documents, testified that Marylyn appeared cognizant of what she was doing when she executed the documents. This evidence is certainly suggestive of competence.

However, in addition to Dr. Butler's opinion, which we have determined to have been improperly excluded, Suzanne also submitted an eighteen-page affidavit from Lori Allen, who cared for David, and then Suzanne, from October 29, 2016, to September 2017. According to Ms. Allen, she spent a considerable amount of time with Marylyn following David's death, including the period Marylyn executed the January 2017 Documents. As to Marylyn's condition during this time period, Ms. Allen stated that: "Marylyn was drinking so much that Affiant sometimes could not wake her up in the morning. Except for when she

was hospitalized, Marylyn Randal was mostly drunk from when David died and when Affiant resigned in September 2017." (1/30/2023 Allen Affidavit at 9.)

During this time period, Ms. Allen recalled Kevin telling Marylyn that Suzanne was "trying to steal her money" and that Kevin took actions to prevent any communication between Suzanne and Marylyn. She also averred that Kevin took over Marylyn's finances and business affairs, and orchestrated the drafting and finalization of the January 2017 Documents. For example, in paragraph 37 of her affidavit, Ms. Allen states:

> In January 2017, Marylyn Randal was so impaired by her excessive drinking that she had no idea what was going on. She had to call Kevin Randal about everything, and Kevin had to call Marylyn every day to tell her what needed to be done that day. Affiant recalls that Marylyn and Kevin were always on the phone and Kevin was running everything.

(1/30/2023 Allen Affidavit at 10.)

"[W]hen a contest is pitched on both mental incapacity and undue influence, evidence that tends to show both need not be as convincing as would be essential to prove one or the other alone." *Roland v. Eibeck*, 385 S.W.2d 37, 40 (Ky. 1964). In addition to Dr. Butler's medical testimony that Marylyn was in an infirm condition between December 2016 and February 2017, Ms. Allen, who interacted with Marylyn on a daily basis, testified about her excessive drinking and cognitive capacity, or lack thereof, during this time period. Much the same as the

evidence reviewed by the Court in *Getty*, when reviewed in a light most favorable to Suzanne this evidence suggests that Marylyn was a "physically weak testator" at the time of the execution of the January 2017 Documents and "could have been a 'mentally impaired testator' at that time, as well." *Getty*, 581 S.W.3d at 558.

We will now briefly examine the evidence of the other badges or indices of undue influence. Whether the January 2017 Documents can be termed "unnatural" is a factor that does not come down squarely for either side. Some might say totally disinheriting one's daughter might be "unnatural." However, it was not without precedent in this family, as Suzanne had been disinherited as part of 2009 Amendment before being partially restored as part of the 2015 Amendment. Still, for the purposes of summary judgment, and viewing the evidence in a light most favorable to Suzanne one could deem such conduct as "unnatural" in view of the family's discussions about increasing/equalizing Suzanne's share just a few months prior to January 2017.

Ms. Allen's affidavit demonstrates facts sufficient to establish the next three badges – restricting contacts with the natural objects of the decedent's bounty, participation by the beneficiary in the preparation of the testamentary documents, and control by the beneficiary of the business affairs of the testator. The last badge – a lately developed and comparatively short period of close relationship – is absent here. Kevin was Marylyn's son and he lived and worked

on the same farm as Marylyn.  The absence of one badge, however, is not dispositive.  *Rothwell v. Singleton*, 257 S.W.3d 121, 125 (Ky. App. 2008) ("We conclude that there were sufficient 'badges' of undue influence to submit the issue to the jury.").

When reviewing a motion for summary judgment, the court must be ever mindful of its very limited role.  That role is to determine whether disputed material facts exist; it is not to decide factual disputes.  Courts should not weigh the evidence because that is the role of the jury, not the judge.  *Shelton v. Ky. Easter Seals Soc., Inc.*, 413 S.W.3d 901, 905 (Ky. 2013).  "It clearly is not the purpose of the summary judgment rule, as we have often declared, to cut litigants off from their right of trial if they have issues to try."  *Steelvest*, 807 S.W.2d at 480.  At this stage, we are simply reviewing the evidence to determine whether Suzanne presented sufficient evidence of undue influence/lack of capacity to overcome summary judgment.  Having reviewed the evidence, we must conclude she did so, and the trial court erred when it granted summary judgment to Appellees on Suzanne's lack of capacity/undue influence claims.  Accordingly, we must remand such claims to the trial court for further proceedings.

This brings us to Suzanne's final assignment of error.  Suzanne contends the trial court improperly limited discovery by restricting the time periods for which Appellees were required to produce Marylyn's medical, legal, and

financial records. Specifically, the trial court's orders limited Suzanne's discovery of Marylyn's medical records to the period between January 1, 2016, and August 31, 2017, and her legal and financial records to the period between January 1, 2016, and March 1, 2017. Suzanne contends that it was an abuse of the trial court's discretion to impose such arbitrary beginning and ending dates for the requested discovery.

"[T]rial courts do enjoy great leeway and discretion in entering and enforcing discovery orders." *Southern Financial Life Ins. Co. v. Combs*, 413 S.W.3d 921, 932 (Ky. 2013). Given the allegations pleaded by Suzanne, we cannot determine that the trial court abused its discretion when it limited discovery to the time periods at issue. While Suzanne might have liked to obtain discovery beyond these dates, the dates selected by the trial court sufficiently encompass the relevant time period. In short, the trial court did not abuse its discretion in reducing Suzanne's discovery requests to the relevant time period. *See Humana, Inc. v. Fairchild*, 603 S.W.2d 918, 922 (Ky. App. 1980) ("It has been a long-recognized principle, with regard to discovery proceedings, that such proceedings must be kept within reasonable bounds and restricted to questions having substantial and material relevancy."); CR 26.02(1). Rather, the trial court acted well within its broad discretion to determine what discovery is appropriate and to

tailor discovery to materially relevant information. *Sexton v. Bates*, 41 S.W.3d 452, 455 (Ky. App. 2001).

## IV. CONCLUSION

For the reasons set forth below, we (1) affirm the Woodford Circuit Court's September 2, 2020, and September 30, 2020, discovery orders; (2) reverse the Woodford Circuit Court's February 8, 2023 order sustaining Appellees' motion to exclude Appellant's expert, Dr. Walter Butler; (3) affirm the trial court's March 23, 2023 order granting summary judgment to Appellees on Appellant's breach of oral contract claim; (4) reverse the trial court's March 23, 2023 order granting summary judgment to Appellees on Appellant's lack of capacity and undue influence claims as related to the testamentary documents Marylyn Randal executed in January 2017; and (5) remand this matter for additional proceedings.

ALL CONCUR.

BRIEFS FOR APPELLANT:

J. Robert Lyons, Jr.
Lexington, Kentucky

BRIEF FOR APPELLEES:

Bethany A. Breetz
Louisville, Kentucky

Marshall R. Hixson
Richard Wehrle
Lexington, Kentucky

Donald J. Kelly
Louisville, Kentucky